BAILEY G. MANNING *v.* THE STATE.*

*(Nashville.* December Term, 1926.)

Opinion Filed March 28, 1927.

1. **CRIMINAL LAW. Felony. Discharge of jury or juror, by court, upon necessity or for cause. Former jeopardy.**

The trial judge may discharge the jury, or a single juror, after the accused has been put upon his trial when legal necessity, or the ends of public justice require, but this cannot be done capriciously; and does not operate to discharge the defendant as having been in former jeopardy. (Post, p. 271-272.)

Citing: State v. Curtis (5 Humph.), 24 Tenn., 601; Snowden v. State (7 Baxter), 66 Tenn., 484; Green v. State, 147 Tenn., 299; 16 R. C. L., 319, par. 125; Mahala v. State (10 Yerg.), 18 Tenn., 531; State v. Hansford, 14 L. R. A. (N. S.), 584; Reascher, 57 L. R. A. 807; Yarbrough v. State, 105 Ala., 43; 12 Enc. Pl. & Pr., 647; Boyd v. State, (14 Lea), 82 Tenn., 167; State v. Scarbrough, 2 S. C., 439; State v. Hall, 9 N. J. L., 256; State v. Allen, 46 Conn., 535; State v. Price, 77 Iowa, 245.

Citing and distinguishing: Cartwright v. State (12 Lea), 80 Tenn., 628; Walker v. State, 118 Tenn., 375.

2. **SAME. Same. Same. Mistrial.**

A discharge of the jury for manifest necessity results only in a mistrial, so that the accused may be put to trial before another jury. (Post, p. 272.)

Citing: Cartwright v. State, 12 Lea 620; Harris v. State, 8 Humph., 597; Riley v. State, 9 Humph., 649.

3. **SAME. Same. Same. Removal of juror for cause to promote the ends of public justice.**

---

*On right of court to discharge juror without working acquittal, see 16 R. C. L., 319; 3 R. C. L. Supp., 562; 5 R. C. L. Supp., 878.

Opinion gained from newspaper as disqualification of juror in criminal case, see 35 L. R. A. (N. S.), 985; 16 R. C. L., 266; 3 R. C. L. Supp., 556.

The procedure by the trial court, upon discharge of a juror for cause, as the willful evasion from the custody of the jury officer, should be to retain the undischarged jurors, and select another to supply the vacancy, and re-tender the entire list, the eleven and the new juror, to the defendant, when he could only use his unexhausted challenges, but not as to the original jurors—when witnesses will be re-examined and the cause heard by twelve jurors. (Post, p. 273.)

Citing: Garner v. State (5 Yerg.), 13 Tenn., 159; Rex v. Edwards, 3 Campbl., 207; 4 Taunt, 309; Wharton Pl. & Pr., par. 508, Note; People v. Stewart, 64 Cal., 660; People v. Zeigler (Cal.), 56 L. R. A., 882; State v. West, 42 Fla., 244; State v. Hazledahl (N. D.), 16 L. R. A., 150; State v. Davis, 31 W. Va., 390.

4. SAME. Same. Right of jury trial. Constitutional provision.

Article 1, section 6, of the Constitution providing that jury trial shall remain inviolate protects the right as it existed at common law. The Constitution assures a fair and impartial trial before a fair and impartial jury, but this does not mean blind adherence to useless form, the reason for which lies in the forgotten past, and the necessity for which cannot be adopted to existing conditions. (Post, p. 275.)

Citing: State v. Sexton, 121 Tenn., 35. Berry v. Wallace, 1 Overton, 241.

5. SAME. Same. Same. Right to challenge jurors.

The right to challenge is not the right to select a juror. If from those who remain after the right of rejection has been exercised, an impartial jury is obtained, the traditional right of the accused is maintained. (Post, p. 275.)

Citing: Wooten v. State, 99 Tenn., 189; Mahon v. State, 127 Tenn., 535.

6. SAME. Same. Competency of juror. Opinion based on newspaper account.

When juror had read newspaper accounts of the testimony of witnesses, but said he could after hearing the evidence, fairly consider it and give the accused a fair and impartial trial, and the trial judge found him to be impartial, with no fixed opinion and no mental bias, such juror is not disqualified. (Post, p. 277.)

Citing: Acts 1911, ch. 32; Acts 1909, ch. 249; Scribner v. State, 35; L. R. A. (N. S.), 985 and notes; Palmer v. State, 21 Tenn., 488; McNamara v. State, M. S. 1919; Conatser v. State (12 Lea), 80 Tenn., 436.

7. CRIMINAL LAW. New trial. Court's disapproval of verdict.

The statement of the trial judge "that the Jury had convicted, and the court will not disturb the verdict," upon overruling motion for new trial, followed by a judgment upon the verdict, does not imply his disapproval, but coupled with his action shows his approval of the verdict. (Post, p. 283.)

---

*Headnotes 1. Criminal Law, 16 C. J., section 2530; 2. Criminal Law, 16 C. J., section 2536; 3. Juries, 35 C. J., section 489; 4. Criminal Law, 16 C. J., sections 394, 405; 5. Juries, 35 C. J., sections 404½, 410; 6. Juries, 35 C. J., section 490; 7. Juries, 35 C. J., section 489; 8. Juries, 35 C. J., section 14 (Anno); 9, 10. Juries, 35 C. J., sections 163 (Anno), 289; 11-13. Criminal Law, 17 C. J., section 3751; Juries, 35 C. J., sections 388, 489. 14. Criminal Law, 16 C. J., section 2762½ (Anno); 15, 16. Criminal Law, 16 C. J., section 2707; Homicide, 30 C. J., section 557.

---

FROM CLAIBORNE.

---

Appeal from the Circuit Court of Claiborne County.— HON. W. H. BUTTRAM, Judge.

L. D. SMITH, WM. I. DAVIS, JOHN P. DAVIS and J. H. S. MORRISON, for Bailey Manning.

W. T. COLEMAN, Special Counsel for the State.

MR. JUSTICE COOK, delivered the opinion of the Court.

On the evening of October 20, 1924, Dr. E. J. McDaniel was shot from an automobile and killed while walking on the street between his home and the Post Office at Tazewell. For the homicide his brother-in-law, Bailey G. Manning, was convicted, and from the judgment of conviction has appealed and assigned errors.

Plaintiff in error, hereafter referred to as defendant, was arraigned and the trial proceeded until all the evidence was introduced. Then Ellis Amos, one of the trial jurors, on the night of April 4, evaded the custody of the jury officer and remained at large until arrested at a point twenty-five miles from the court house and was brought into court on April 7. After investigation the trial judge punished the juror for contempt and dismissed him from the jury. Whereupon counsel for defendant moved the court to discharge the prisoner because once in jeopardy. The motion was overruled. Whereupon the defendant moved the court to discharge the jury and enter a mistrial. The motion was overruled, the trial judge saying that the conduct of Amos made it necessary to dismiss him and instead of entering a mistrial the vacancy would be supplied, and that each party would be allowed the unexhausted peremptory challenges in selecting a juror to supply the vacancy.

The defense insisted that the discharge of Amos restored the original challenges, but the court held against this insistence and defendant exhausted the remaining challenge, after which juror J. H. Lambert was presented, passed by the State and after examination by the defendant was peremptorily challenged. The court denied the right of additional challenges holding that defendant's challenges must be limited to those unexhausted on the original panel. Mr. Lambert was held competent, ordered to take his place on the jury, and was sworn. The eleven jurors were not re-sworn. The trial judge announced that the vacancy on the jury had been supplied and the cause would proceed. The defendant then tendered a formal plea of former jeopardy which was stricken on motion of the State, and the cause was tried *de novo*.

The first propositions presented by defendant's assignments of error are that the trial judge; (1) should have discharged the jury and entered a mistrial. (2) that upon the proceeding to supply the vacancy on the jury defendant should have been allowed all his peremptory challenges which it is insisted were restored upon discharge of the juror for cause. (3) That the discharge of the juror was unauthorized and that the trial judge should have sustained the plea of former jeopardy presented both before and after the commencement of the trial *de novo*.

Juror Amos rendered himself unfit to remain on the jury and participate in the trial. *Cartwright* v. *State,* 12 Lea, 620. He had been at large in contact with outside influences for three days under circumstances that made it impossible to show that the defendant was not prejudiced by the separation. *Harris* v. *State,* 8 Humph., 597; *Odel* v. *State,* 6 Bax., 159; *Riley* v. *State,* 9 Humph., 649.

Two courses were open for the trial judge to pursue. To reseat the juror, resume the trial and trail through a formal procedure to a void verdict, or discharge the juror whose misconduct made it apparent that his further participation in the trial would vitiate the verdict. Originally at common law the court could not discharge a juror after he had been sworn in a criminal case. 4 Blk. Comm., 360. Another archaism was that the jury once sworn in a case affecting life and member could not be discharged without giving a verdict. This rule was so strictly adhered to that drastic methods were used to compel a verdict, such as depriving jurors of refreshment, and in winter of warmth, and when they did not agree upon a verdict before adjournment they were car-

ried in carts from court to court until they made a deliverance.

In *Berry* v. *Wallace,* 1 Overton, 241, our court naively suggested the impracticality of carting jurors around with the judge on the frontier circuit, and refused to follow the common-law practice, and held that the adjournment of the term without a verdict resulted in a mistrial. Rules like these thread back to ancient customs, the reason for which has been forgotten and are abandoned, and now the trial court may, for legal cause, discharge the jury or a single juror after the accused has been put upon trial. *State* v. *Curtis,* 5 Humph., 601; *Snowden* v. *State,* 7 Bax., 484; *Green* v. *State,* 147 Tenn., 299.

In 16 R. C. L., page 319, par. 125, it is said:

"It was at one time thought that, in criminal cases, a juror could not without giving a verdict be withdrawn, or a jury discharged, when sworn. But ·this rule has given way to the more reasonable one now universally recognized that the court may discharge a jury whenever an absolute or compelling necessity for so doing exists; but, in criminal cases especially, only when such necessity exists."

Left to pursue one of the two courses heretofore referred to, the trial judge dismissed the juror, and his action was grounded upon legal necessity and did not operate to discharge the defendant as having been in former jeopardy. *Mahala* v. *State,* 10 Yerg., 531; *State* v. *Hansford,* 14 L. R. A. (N. S.), 584; *Re Ascher,* 57 L. R. A., 807; *Yarbrough* v. *State,* 105 Ala., 43.

The authorities cited to sustain the assignments of error to the action of the court on defendant's plea of former jeopardy relate to the unauthorized discharge of jurors. As for instance for disqualification *propter de-*

*fectum.* The right of challenge *propter defectum* ends when the jurors are accepted and sworn. By waiver the juror becomes a legal juror. *Cartwright* v. *State,* 12 Lea, 628; *Walker* v. *State,* 118 Tenn., 375. A juror so accepted, despite the right of challenge for cause, may participate in the trial without vitiating the verdict. The discharge of a juror for cause *propter defectum* after sworn is the illegal discharge of a juror, it does not spring from necessity, hence cannot work acquittal for former jeopardy. Not so, however, when the juror is discharged for sickness or other legal cause. 12 Enc. Pl. & Pr. 647; *Boyd* v. *State,* 14 Lea, 167; *State* v. *Scarborough,* 2 S. C., 439; *State* v. *Hall,* 9 N. J. L., 256; *State* v. *Allen,* 46 Conn., 535, *State* v. *Price,* 77 Iowa, 245.

The great weight of authority is that the trial judge may discharge the jury or a single juror after the accused has been put upon his trial when necessity or the ends of public justice require but that it cannot be done capriciously. When a single juror is discharged because of sickness or other necessity, the authorities vary as to the procedure that must follow. It was once supposed that when a person was put upon trial for a crime before a jury he was entitled to a verdict from that jury, and a discharge without a verdict was equivalent to acquittal. But this rule gave way to the more reasonable rule that a discharge of the jury for manifest necessity resulted only in a mistrial, and that the prisoner could be put to trial before another jury.

The next step toward rationalizing the procedure upon discharge of a juror for sickness or other necessity, was to retain the undischarged jurors, and select another to supply the vacancy, and retender the entire list, the eleven and the new juror to the prisoner with right to peremptorily challenge them as they came to the book, as

if there had been no prior empanelment, and upon acceptance of the jury to proceed with the trial *de novo.*
*Rex* v. *Edwards,* 3 Campbl., 207; 4 Taunt. 309, Wharton Pl. & Pr., par. 508, Note.

This procedure was observed in *People* v. *Stewart,* 64 Cal., 660, and *People* v. *Zeigler* (Cal.), 56 L. R. A., 882, under a Statute that authorized the discharge of a juror to be followed by trial *de novo,* and in the absence of Statute in *West* v. *State,* 42 Fla., 244. Our court in Garner 1. State, 5 Yerg., 159, applying a Statute similar to the California Statute held that the trial judge could either discharge the panel, or discharge a juror for physical or mental incapacity, supply the vacancy and proceed *de novo,* but that the peremptory challenges were restored to the prisoner confined, however, in their use in the selection of the new jurors, and that none of the retained jurors were subject to challenge.

In *State* v. *Hazledahl* (N. D.), 16 L. R. A., 150, under a Statute similar to that referred to in *People* v. *Zeigler,* and *Garner* v. *State,* the court held that the trial judge should supply any vacancy caused by the necessary discharge of a juror and that the accused could only use the unexhausted challenges, and that none of the original jurors were subject to challenge. In *State* v. *Davis,* 31 W. Va. 390., under a Statute that authorizes the substitution of a juror, unable from any cause to perform his duty, the court observed the procedure followed in *State* v. *Hazledahl,* and pertinently observed that if the whole jury could be discharged and another empaneled, why not a single juror and his place supplied.

The prisoner in this case had his challenges in selecting the original jurors, and the right to his unexhausted challenges on supplying the vacancy. The rule of the common law derived from the ancient custom that when

155 Tenn.—18.

a person is once put on trial before a jury he is entitled to a verdict from that jury, has been abandoned as well as the custom that the trial judge could not after the jury was sworn discharge a juror. The ancient custom that the jury when empaneled and sworn must make deliverance of a verdict affords no more reason for holding that a vacancy on the jury cannot be supplied than for holding that the jury should be carted from court to court until they agree on a verdict, or that the discharge of a jury before verdict delivers the prisoner from jeopardy as if acquitted. Our Statute authorizes the substitution of a juror in the place of one excused for sickness. But the court has authority aside from any Statute to excuse a juror for legal necessity, and this implies the right to substitute another instead of the one discharged, and proceed with the trial *de novo* so as to avoid unnecessary expense and delay.

Trial judges are charged with important administrative and executive duties to be reasonably exercised according to a sound discretion, without which a trial could not be ended nor justice be accomplished. Any rule, without a reason, that hinders an exercise of the administrative and executive powers of courts impairs and may altogether suspend their proper functions and defeat the object of their existence. Rules of procedure are of course necessary, and they must be observed, but observance of an antiquated procedure is justified only as it is supported by reason. Observance of bare mechanical forms, the reason for which no longer exists, and not affecting the substantive rights of litigants is no more justified in the administration of the business of courts than would be the application of an antiquated, inadaptable theory of architecture to a modern build-

ing problem.  Procedural law must respond to rational administration.

Article 1, Section 6, of the Constitution providing that jury trial shall remain inviolate protects the right as it existed at common law.  *State* v. *Sexton,* 121 Tenn., 35. The Constitution assures a fair and impartial trial before a fair and impartial jury, but this does not mean blind adherence to useless forms—the reason for which lies in the forgotten past, and the necessity for which cannot be adapted to existing conditions.

The right of challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit, and peremptory challenge was intended to exclude those suspected of bias or prejudice.  Both rights of challenge were assured at common law, as procedural instruments for use to reject jurors as a means of obtaining an impartial jury, which is all that the common law proposed to give, and all that the fundamental law assures.  The right to challenge is not the right to select a juror.  If from those who remain after the right of rejection has been exercised, an impartial jury is obtained the traditional right of the accused is maintained.  *Wooten* v. *State,* 99 Tenn., 189.

In *Mahon* v. *State,* 127 Tenn., 535, it is said the Constitution guarantees the accused a fair and impartial trial which necessarily includes a trial before a fair and impartial jury.  But the constitution does not secure the accused the right to challenge proposed jurors, for that is a right which may be taken away by the legislature. At common law thirty-five challenges, one short of three juries were allowed the accused, but if he challenged a greater number the law pronounced death upon him, if on trial for treason, and for lesser felony subjected him to *piene fort et dure,* or mercifully hanged him.  The

right of challenge has been reduced in this State to fifteen, but without bringing forward the unreasonable practices of the common law attendant upon an improvident use of challenges.

Here the accused was given the right to exercise fifteen peremptory challenges, and the right to challenge for cause in selecting the original twelve jurors. During the progress of the trial one of the original jurors was guilty of such conduct as would have vitiated the verdict had he participated in it, and the trial judge of necessity dismissed him. The vacancy was supplied and the accused was allowed to use the remaining challenges in finally making the jury which tried the cause. The witnesses were re-examined and the cause was heard by twelve jurors.

The question to be considered on appeal is whether or not defendant was denied a fair and impartial trial by a fair and impartial jury as at common law, for chapter 32, Acts of 1911, provides, no verdict or judgment shall be set aside or new trial granted by any of the appellate courts of this State . . . for any error in any procedure in the cause unless . . . after an examination of the entire record it shall affirmatively appear that the error complained of affected the result of the trial. This Act cannot be construed so as to impair the right of the prisoner of a fair and impartial jury, hence we must consider whether the procedure had such effect. No complaint is made that any of the original eleven jurors were not fair and impartial. Juror Lambert, who was selected to supply the vacancy stated in the examination upon the *voir dire* that he had formed an opinion, but that it was based upon newspaper reports. He had read newspaper accounts of the testimony of witnesses, but said he could, after hearing the evidence, fairly con-

sider it and give the prisoner a fair and impartial trial. His examination disclosed no bias or prejudice unfavorable to the prisoner, and the trial judge found him to be impartial. The jurors statements indicate that he had no fixed opinion and no mental bias, such as would forbid him giving impartial consideration to the case. He was emphatic in the statement that he could render a fair and impartial verdict upon the law and the evidence. Such a juror is not disqualified. *Scribner* v. *State,* 35 L. R. A. (N. S.), 985, and notes, *Palmer* v. *State,* 21 Tenn., 488.

Chapter 249, Acts of 1909, provides:

''That, notwithstanding a person presented as a juror in a criminal case may state that he has former and expressed an opinion as to the guilt or innocence of the accused, based upon newspaper statements or like sources of information, still, if he will further state on oath that notwithstanding such opinion, if chosen as a juror, he believes he can give the defendant a fair and impartial trial upon the law and the evidence, and the trial judge should be of opinion that he is a fair juror, then such person may be accepted as a juror, provided he is otherwise qualified to act as a juror in the case.''

In *McNamara* v. *State,* Ms. 1919, Chief Justice GREEN referring to the Statute said, we think under a proper construction of the Act of 1909, a juror is not disqualified who has read about a case in a newspaper, if he is, notwithstanding indifferent as between the State and the defense, and can fairly consider the case upon the law and evidence. After referring to *Conatser* v. *The State,* 12 Lea, 436, said further, the burden is upon defendant to show the disqualifying nature of the information upon which the opinion is based. After a reference to the information drawn solely from the *voir dire* examination,

it must be concluded that Lambert was an impartial juror.

A review of the facts is necessary to dispose of the remaining assignments of error.

McDaniel while walking from his home to the Post Office was shot by some person from an automobile. Mrs. Davis, her son and daughter who were near, saw the automobile and some of them saw the gun pointed from it. They saw the automobile move away and pass toward the Cumberland Gap road. They also saw I. N. Mink's car which was immediately behind the car from which the shots were fired.

Mink heard the shots but did not see the shooting and did not know of it until he returned to his home. He followed the car from which the shots were fired out the Cumberland Gap road, a distance of about 3400 feet, to which point he was carrying a friend, and from which he returned to his home at New Tazewell. He observed the car from which the shots were fired turn in to Brooks Lane, a blind road. After Mink returned to his home at New Tazewell, he heard of the killing. He returned to Tazewell and from there went to the point where he saw the car drive into the blind road and observed the tracks. He and those with him testify that the tracks ran into the blind road, turned and came back toward Tazewell. The tracks of the car were also observed at the scene of the killing. These tracks were described to be such as would be made by a United States Balloon tire with a brick tread. The evidence shows that the time required to make the trip from the point where Dr. McDaniel was shot to the point where the car turned, and went back to the Manning house, would be approximately five minutes.

Mrs. Crutchfield heard the shots and after some inconsequential delay, went into her house, put on her coat, walked into the Cumberland Gap road a short distance from its intersection with Middle street on which Manning lived, and testifies that Manning drove his car past her and went into Middle street.

Mrs. Cook and Mrs. Robinson, who lived on Middle street between where Mrs. Crutchfield says Manning passed her and Manning's home, heard the shooting and the confusion, and started to Dr. McDaniels. Miss Naoma Cook did not go beyond the front door or window. She testifies that she observed a car which she took to be Manning's car driven by a man whom she recognized as Manning, pass her home toward Manning's Mrs. Cook saw the car but did not recognize the driver. Mrs. Robinson saw it as it passed toward Manning's and the Francisco barn, and says the driver wore a dark flat top or crushed crown hat.

Between the Cook place and Manning's the car passed George Myers and his son Clay, age ten. Myers saw the car pass Cook's, observed the driver and says he took him to be Manning. He also observed the flat top hat. Clay Myers testified that as the car passed him, the driver looked out, that he wore a flat top hat, and that he took him to be Manning. The Myers are related to Manning and the testimony of the boy when considered in connection with the relationship coupled with the character of his statements indicates a positive identification.

Mr. Geisler, pastor of the Methodist Church, heard the shots as he was on his way to the Post Office. He did not know that a killing had occurred, but in order to discover the person guilty of the disorder, he walked up the hill to Middle street so that he might observe the car from which the shots were fired, and after awhile saw the

bright lights of a car coming back to town, come into Middle street, pass Crutchfield's, pass the Cook place and the point where George Myers met it on to the Francisco barn where it turned. He endeavored to get the number of the car but could not. After turning it went back to the front of Manning's house and was parked there headed toward the Cumberland Gap road. This witness states that two men occupied the car. One of them got out, went into Manning's house, came back to the road and went down it toward town. He says the man wore unionalls, a hat with the crown crushed so as to make a flat top hat, which describes Manning's apparel on the night of the killing.

Five days before the killing, Manning who owned a No. 12 automatic shot gun purchased from a hardware store in Tazewell five No. 12 shot gun shells. The store handled Western Field and Remington shells, but the witnesses testify that the broken boxes were No. 3 and 4 shot, and that there were no broken boxes of Remington shells in the store, and that they had only No. 6 and 8 Remington shells on hand. The evidence shows that McDaniel was shot from a twelve gauge gun shooting Western Field shells loaded with No. 3 shot.

Manning testifies that when the shooting occurred he was in front of Montgomery's store and had started to supper, that he asked young Foley about the shooting and went on to his home where he met his wife on the porch, and where Fugate, a witness, called from his room in a building nearby to inquire about the shooting, that after a minute he went back to town to make inquiry, and was there covering the period when Mrs. Crutchfield and other witnesses say he was passing out of the Cumberland Gap road into Middle street.

Foley testifies that he saw Manning just before the shooting in front of McNeeley's ice cream parlor, and fixed the time that the shots were fired at three minutes after talking to Manning. Fugate testifies that he heard the shots, raised his window, and heard foot steps and to his inquiry Manning replied that he did not know the occasion of the shooting.

Mrs. Manning testified that she used the car a short while before the shooting, drove it back to her home and parked it in front of the house where it was standing when she heard the shots. Hearing them she came to the front porch and saw her husband coming up the street. She says she heard Fugate make the inquiry and her husband's reply, and saw Manning go back to town after which she went over to Dr. Stone's, and where George and Clay Myers and Milt Cook saw her after the shooting passed the Stone office.

George and Clay Myers walked in front of the Manning home toward the Cook place. George Myers and four other witnesses testify that no car was parked in front of the Manning house at that time. James Greer and two other witnesses testified that Manning's car was parked there after the shooting, and Geisler saw the car which afterwards stood in front of Manning's when it turned at the Francisco barn, and passed back, and stood in front of the Manning house facing east with the lights on. In this testimony he is corroborated by reliable witnesses.

The tracks observed by Mink when the car turned at the blind road and came back to Tazewell and similar tracks at the point of the killing corresponded precisely with the United States Balloon tires with brick treads that were on Manning's car. The evidence shows that the car from which the shots were fired had bright lights,

was a sport model Dodge, answering the description of Manning's car. Without a doubt, the shots fired from the car just ahead of Mink's car, and whose tracks indicated that it turned back at the blind road, as observed by Mink, was Manning's car. Manning's wife testifies that her husband's car was standing in front of the house at the time of the killing, and when her husband came to the house after the killing, but it was not there when George and Clay Myers, and Milt Cook saw Mrs. Manning at Dr. Stone's office, nor when Myers passed Manning's house. It was not there when a man answering Manning's description driving a car answering the description of his car, passed Mrs. Crutchfield near the entrance to Middle street, and passed Mrs. Robinson, Mrs. Cook and Miss Naoma Cook, George Myers and Clay Myers between the point where Mrs. Crutchfield says she identified Manning as the driver, and Manning's home.

Mr. Geisler says it was not there when he observed the same car that passed the persons above indicated, drive down to the Francisco barn, turn, go back to the Manning house and stop in front of the house where one of the occupants left the car and went into Manning's house from which he soon came out, and turned down the street toward Lester's restaurant, when the Greeber boy told Manning that McDaniel had been shot.

The circumstances presented by this record so strongly establish the fact that the shots were fired from Manning's car, which was driven by him, as to exclude any other conclusion than that he fired the shots that caused the death of McDaniel. It appears from the record that Manning and McDaniel were brothers-in-law, and that Manning was involved with McDaniel's wife to such extent as to cause a separation. McDaniel was preparing to leave Tazewell and locate in Knoxville, and was mak-

ing no arrangement to carry his wife. There is evidence of hostile feeling, and of threats of Manning against McDaniel.

The evidence is sufficient to supply a motive for the killing and the manner in which it was done indicates a familiarity with the local situation and with McDaniel's habits. Pending the excitement immediately following such a tragic scene on the streets of a village, witnesses do not accurately measure the flight of time. It is established by the record that within five minutes one familiar with the location of the road could have driven an automobile from the point where the shots were fired to the place where Mink observed the car turn into the blind road where it turned around and came back to Tazewell, and could have appeared at the restaurant at the time Manning made the inquiry of the Greeber boy about the shooting. Mink observed a crowd near the place where the shooting occurred as he returned passing through Tazewell to his home beyond. He did not then know that McDaniel had been shot. The evidence shows that McDaniel's body had not been carried to the house when the car passed Mrs. Cook and Mrs. Robinson on its way toward the Francisco barn.

The evidence in support of Manning's *alibi* does not overcome the theory of the State which sustains the verdict. We cannot find that any ruling of the trial judge affected the merits of the case.

It is complained that the trial judge did not approve the verdict of the jury. After the motion for a new trial was presented the trial judge in overruling it said that the jury had convicted, and the court will not disturb the verdict. This was followed by a judgment upon the verdict, and the statement of the trial judge does not

imply his disapproval, but coupled with his action shows his approval of the verdict.

We do not minimize the grave responsibility that rests upon trial judges called upon to review the proceeding on motion for a new trial, nor the imperative duty that rests upon the appellate courts to review the records, after action by the trial judge, and correct errors. Each party is guaranteed a fair and impartial trial, and under our system the trial judge, upon motion for a new trial, is required to review the record and the evidence. He alone, after the jury has convicted, can give the accused the benefit of the reasonable doubt that always attends the prisoner in a criminal case until final action in the trial court, and on such review it is the duty of the trial judge to consider the weight of evidence and determine whether or not it establishes the prisoner's guilt beyond a reasonable doubt. On this record the evidence is sufficient to establish guilt to the required degree of certainty.

We have carefully considered the remaining assignments of error, and find that they in no wise affect the merits of the case.

It follows that the judgment of the trial court must be affirmed.