IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 6, 2017

**STATE OF TENNESSEE v. CHRISTOPHER KING KNIGHT**

**Appeal from the Circuit Court for Hardin County**
**No. 9776      C. Creed McGinley, Judge**

_____

**No. W2016-00673-CCA-R3-CD**

_____

A Hardin County jury convicted the Defendant, Christopher Knight, of second degree murder, and the trial court sentenced him to twenty-two years in confinement. In this appeal, the Defendant contends that: (1) the trial court failed to excuse a juror for cause when the juror had extrajudicial information about the Defendant; (2) the trial court failed to perform its role as the thirteenth juror; and (3) the evidence is insufficient to support his conviction. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Benjamin S. Harmon, Savannah, Tennessee, for the appellant, Christopher King Knight.

Herbert H. Slattery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Matthew F. Stowe, District Attorney General; John Turnbow and Carthel L. Smith, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Procedural Background**

This case arises from the murder of the victim, the Defendant's mother, inside her home. For this offense, a Hardin County grand jury indicted the Defendant for first degree premeditated murder.

**A. Voir Dire**

During voir dire, the State questioned prospective jurors, and one juror identified himself as being personally acquainted with the Defendant. The juror stated that his son knew the Defendant and that his son and the Defendant had had "trouble in the past." The juror stated that any past experiences with the Defendant would not influence his ability to serve as a juror and would not affect his ability to act as an impartial juror in the trial.

Outside the presence of the jury, the juror stated that his son and the Defendant had been employed by the same person in the past and that the Defendant had spent the night at the juror's house in the past. He clarified that the "trouble" from the past was that the Defendant and the juror's son were "on drugs." The juror stated that the Defendant was "the reason" the juror's son was on drugs. The juror explained that he "partially" blamed the Defendant for his son's drug use. Trial counsel for the Defendant argued that, while the juror expressed that he could be fair, the fact that the Defendant had helped the juror's son become addicted to drugs or was partially to blame for the addiction was "the type of thing that should not be in a juror's mind." When questioned by the trial court, the juror stated that this would not affect his ability to serve on the jury in any way. The Defendant lodged no further objection but requested that the juror be excused for cause. The trial court refused, noting the juror's response that he would not be "affected."

**B. Trial**

The case proceeded to trial, and the parties presented the following evidence: Sergeant Victor Cherry testified that he had been employed by the Savannah Police Department for thirty-one years and that he responded to a "prowler" call late in the evening of March 9, 2013, or in the early morning of March 10. The call was made to the police by the Defendant, and Sergeant Cherry responded to the address provided. As he pulled up to the residence, the Defendant approached him from the residence and said someone had been trying to steal gas from his mother's vehicle. Sergeant Cherry left the scene to patrol the surrounding blocks for the suspect. The Defendant then called the police dispatch a second time and requested Sergeant Cherry come back to the residence, so Sergeant Cherry returned.

Officer Mark Mitchell testified that he was employed by the Savannah Police Department and that he responded to a call in March 2013 at around 11:45 a.m. When he arrived at the scene, the Defendant was exiting the residence, while on the phone with the 911 dispatcher, and told Officer Mitchell that something "bad" had happened to his mother, the victim. The Defendant led Officer Mitchell inside the residence into the dining room where he detected the strong odor of gasoline. The Defendant led him over to where two bottles of what appeared to be gasoline were lying on the floor; one bottle had a paper towel sticking out of it as "possibly a wick." The Defendant then led him to the victim's bedroom door. A "blue housecoat or robe" was pushed up against the bottom of the door covered in "some kind of liquid." Officer Mitchell moved the door and observed

2

the victim lying on the floor. He detected the smell of gasoline in the bedroom. Officer Mitchell felt for the victim's pulse and, finding none, called an investigator.

The Defendant told Officer Mitchell that he had just returned from breakfast a few minutes prior to Officer Mitchell's arrival. Officer Mitchell recalled that inside the house, near the gasoline containers, was a lit gas heater, which he promptly turned off to avoid an explosion. Officer Mitchell stated that there appeared to be trauma to the victim's head and that her head and hair were covered in blood. A large amount of blood was present on her bed. Officer Mitchell observed that the blood had begun to dry. Officer Mitchell asked the Defendant to wait outside with another officer for the investigator to arrive. He recalled that the Defendant was not crying and did not seem upset.

The investigator, T.J. Barker, testified that he worked for the Savannah Police Department as a Sergeant Investigator and was on call on March 10, 2013, when he responded to the residence. Sergeant Barker entered the victim's residence and smelled the very strong odor of gasoline. He also observed a wall-mounted gas heater on which the pilot was lit. He observed two containers filled with gasoline and paper towels coming out of the top. At the bottom of victim's partially open bedroom door, he observed a robe and dried blood. He also observed the victim's body wedged, to some degree, under the bedroom door, rendering the door immovable. Sergeant Barker then called the Tennessee Bureau of Investigation ("TBI") and left the residence.

Sergeant Barker recalled that the Defendant was told not to wash his hands. The Defendant then walked across the street to a neighbor's house to get a drink. At some point, the Defendant's wife, Tonya Knight, arrived at the scene and spoke with the Defendant. The TBI arrived to process the crime scene. As this was occurring, police officers waited outside the residence and spoke to the Defendant, who said he had woken up that morning and left the residence to go to the bank and get breakfast from Hardee's for himself and the victim. He returned to the residence, took a nap lasting a couple of hours and, when he awoke, he found the victim "this way." Sergeant Barker described the victim's bedroom as having blood on the bed and sheets. He spoke to the Defendant's wife, Ms. Knight, the following day.

Dr. Anjeanette Hall testified that she was the county coroner and responded to the scene. She described the victim's body and the bedroom as an "elderly woman lying up against the doorway with blood and feces smeared around the room." Dr. Hall took the victim's body temperature. She observed signs of struggle throughout the bedroom.

Timmy King testified that he was a criminal investigator employed by the city and that he took a statement from the Defendant at the scene. The Defendant asked him, "Can we not just burn that house down with her in it[?] I really hate to see [the victim] come out

3

of there." Investigator King searched the victim's vehicle, which had a receipt from Hardee's in it and a debit card with a blood stain on it.

On cross-examination, Investigator King agreed that he could not determine what type of weapon, if any, was used to beat the victim and that he did not collect any physical evidence that linked the Defendant to her killing.

Jessica Marquez testified that she was employed by the TBI and tested the blood stain on the debit card; the blood was a match to the victim's blood. Ms. Marquez also tested a pair of men's jeans and a t-shirt, worn by the Defendant at the scene, that had blood on them that matched the victim's DNA. On the t-shirt, several other persons' DNA was present, for a total of three persons' DNA and a blood stain that excluded the Defendant as a contributor was also present. Ms. Knight's DNA was tested as a potential match to the blood stain, and the results were inconclusive. This, Ms. Marquez stated, meant that the blood could not have been from the Defendant and could have been from Ms. Knight.

Terry Dicus testified that he was a TBI criminal investigator and that he investigated the crime scene in this case. After initially entering the victim's residence, Investigator Dicus had to exit and wait outside because the smell of gasoline was so strong. While waiting, he asked the Defendant to remove all of his clothes to be collected for evidence: a pair of jeans, two t-shirts, and a hat. He also told the Defendant not to wash his hands. The clothing was sent to the lab for analysis. Investigator Dicus identified the clothing items for the jury and stated that there appeared to be blood stains on the jeans.

From the Defendant and other sources, Investigator Dicus collected a list of names of people who might have information about the crime or were connected in some way to the victim or the Defendant. While waiting for lab technicians to arrive, Investigator Dicus contacted as many of these people as he could. Later that day, he walked through the crime scene again and discovered a bloody shirt in the backyard. The next day, Investigator Dicus interviewed the Defendant and another investigator interviewed Ms. Knight separately. At some point, the Defendant yelled at Ms. Knight not to tell the police anything and that they would be getting a lawyer.

Randy Livingston testified that he owned Livingston Jewelry in Savannah, Tennessee. On March 9th, the Defendant came into his store wanting to sell him six rings and a "nugget watch bracelet." Mr. Livingston bought the items for the value of the gold in them. He stated that the items were considered ladies jewelry. He paid the Defendant $510 in cash for the items. Mr. Livingston knew that the Defendant was the victim's son and, after learning of her death, he contacted law enforcement to inform them of the Defendant's jewelry sale.

Tonya Knight, the Defendant's wife, testified that she had been married to the Defendant since December 2012 and that they lived at the victim's residence with her. Ms. Knight first worked at Hardee's and then as a nursing assistant at a nursing home. The Defendant was not working at the time they got married. At the time of the victim's death, Ms. Knight was working 12-hour shifts from 6 a.m. to 6 p.m. and transporting herself to and from her workplace. She and the Defendant had several dogs that lived at the residence, including a pit bull that lived in the backyard.

The night of the victim's death, Ms. Knight and the Defendant went into their bedroom to go to sleep and then the Defendant walked out to go to the carport to "work on something." When he returned, he said he had seen a "prowler" and was going to call 911. To her knowledge, the Defendant did not take any action but stated that the prowler could have been a friend coming by to retrieve something from the carport. The Defendant left the bedroom again, and Ms. Knight went to sleep until she was awoken by a scream. Ms. Knight exited the bedroom and went to the front door to look outside and in the carport and did not see anything or anyone. Ms. Knight looked around further inside the house and saw that the victim's bedroom door was cracked open. The Defendant, seeing Ms. Knight, told her that the victim had fallen and to "go on" and then he shut the door. She stated that he meant he was "taking care of" the victim and that Ms. Knight needed to go back to bed, which she did after asking if she could help in any way.

Ms. Knight woke up the next morning and, while getting ready for work, passed by the victim's bedroom door and noticed a blue jacket or robe lying under her door. Later, the Defendant called Ms. Knight at work and told her something had happened and to come home. When she arrived the Defendant told her that someone had broken into the house and hit the victim in the head. While Ms. Knight was at the victim's house, the Defendant walked across the street to a neighbor's house for a drink, and Ms. Knight recalled that he washed his hands with the drink, saying "I cannot stand to have my mother's blood on my hands any longer." Ms. Knight agreed that she heard law enforcement tell the Defendant not to wash his hands. She agreed that there were gas containers stored in the victim's carport.

On cross-examination, Ms. Knight agreed that she was arrested in connection with the victim's death. She stated that she did not know who killed the victim. She agreed that when she first spoke to law enforcement, she failed to tell them about the scream or seeing the blue robe under the door because the Defendant told her not to. Ms. Knight agreed that any charges brought against her were going to be dropped following her testimony.

Linda Hayes testified that she worked with the victim and that they spent a good bit of time together as friends. She identified the jewelry sold to Mr. Livingston by the Defendant as being the victim's jewelry.

Dr. Erica Curry was qualified as an expert in forensic pathology and testified that she performed an autopsy on the victim's body. Dr. Curry testified that there were numerous lacerations or tearing to the skin on the victim's head. There was hemorrhaging throughout the scalp and brain tissue and a small fracture in the victim's skull. The victim's brain was bruised. In total, the victim's head sustained at least twenty-five lacerations or tears to the skin. In her opinion, the victim suffered blunt force trauma to the head. Dr. Curry documented bruises on the victim's chest, arms, and hands, as well as a broken forearm.

On cross-examination, Dr. Curry testified that there was no doubt in her mind that the victim was murdered. She agreed that the victim's injuries suggested she was in a defensive struggle.

The Defendant testified that he and the victim lived together after his father died and then Ms. Knight moved in with them before they got married. He had a "strained" relationship with the victim after Ms. Knight moved in, and the couple began looking for a house. The Defendant had a job that he subsequently lost, but he was able to pay his bills. He sold the victim's jewelry a few days before her death to pay for an expensive cable bill. The Defendant explained that the victim "absolutely" gave him permission to sell her jewelry. The night of the victim's death, the Defendant was playing video games and his mother was in her bedroom. Around midnight, the Defendant checked the carport and believed that someone was stealing gas from one of their vehicles so he called the police. The Defendant later cleaned up some of the gasoline containers sitting in the carport and brought them inside so as not to encourage a potential thief. The Defendant went back inside and went to sleep until Ms. Knight woke up to leave for work.

The Defendant testified that he cooperated with the investigation until the police accused him of murdering the victim. He denied being dependent on the victim for money after he lost his job. The Defendant agreed that, on the day the victim's body was found, he went out to buy breakfast for him and the victim, and when he returned, he knocked on her bedroom door, which was closed, to tell her breakfast was available. Sometime later, he opened the door and found her body in her bedroom. He felt for a pulse and got blood on his hand. The Defendant "flipped" and then called a friend of his to tell him he had found the victim's body. He agreed that it was possible he made eight phone calls before calling the police.

After law enforcement arrived at the scene, the Defendant went outside to get his cigarettes from the victim's car. At that point, he put the victim's debit card, which had been in his pocket, in her vehicle. The Defendant identified the clothes he was wearing at the time, which were the same clothes that had previously been identified as bloodstained. The Defendant agreed that he walked across the street to a neighbor's house and asked for

6

a drink. He also agreed that he washed his hands but stated that he did not remember receiving an instruction not to do so. The Defendant denied making statements about wanting to burn the victim's house down.

Based upon this evidence, the jury convicted the Defendant of second degree murder. The trial court ordered the Defendant to serve twenty-two years in confinement. It is from this judgment that the Defendant now appeals.

## II. Analysis

The State argues that the Defendant's appeal is untimely and that he has failed to argue or demonstrate that the interests of justice require a waiver of the timely filing of a notice of appeal. Tenn. R. App. P. 4(a) (stating that a notice of appeal is to be filed within thirty days of the date that the final judgment is entered). It appears that the Defendant's judgment became final on February 22, 2016, and he filed his notice of appeal on March 24, 2016. We note that Counsel for the Defendant was not appointed until March 24, 2016. After carefully considering the Defendant's reply brief, the seriousness of this offense, and the fact that the notice of appeal was filed only one day late, we have decided, in the interest of justice, to waive the timely filing requirement of the notice of appeal.

Turning to the Defendant's issues on appeal, the Defendant asserts that: (1) the trial court failed to excuse a juror for cause when the juror had extrajudicial information about the Defendant; (2) the trial court failed to perform its role as the thirteenth juror; and (3) the evidence is insufficient to support his conviction.

### A. Failing to Excuse Potential Juror for Cause

The Defendant argues that the trial court violated his constitutional right to an impartial jury by failing to excuse a prospective juror, Mr. Hurley, for cause because the individual "possessed extrajudicial information about [the Defendant], which had already been deemed inadmissible at trial because of its prejudicial nature." The Defendant claims that he was forced to use a peremptory challenge to remove this prospective juror from the panel, thus exhausting his peremptory challenges and rendering him unable to exercise a peremptory challenge against another prospective juror who was the victim's neighbor and who was eventually empaneled on the jury. The State responds that the trial court did not err when it failed to excuse the prospective juror because the juror told the trial court that his knowledge of the Defendant would not affect him in any way.

Rule 24(c)(1) of the Tennessee Rules of Criminal Procedure states that "[a]fter examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause." A prospective juror can also be challenged for cause if:

[t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. The court shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind. A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(c)(2)(B). "Because mere exposure to extrajudicial information does not automatically disqualify prospective jurors, trial courts must assess whether they can serve fairly and impartially given their knowledge of outside information." *State v. Sexton*, 368 S.W.3d 371, 396 (Tenn. 2012) (citation omitted).

The trial court must assess the level of potential prejudice arising from the extrajudicial information, as well as the believability of the juror's promise to remain impartial. *See State v. Shepherd*, 862 S.W.2d 557, 569 (Tenn. Crim. App. 1992). The trial court's accreditation of the juror's testimony is entitled to the weight of a jury verdict. *State v. Swanson*, 680 S.W.2d 487, 489-90 (Tenn. Crim. App. 1984). A trial court's determination as to the impartiality of a prospective juror can be overturned only if there has been an abuse of discretion. *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Scott*, 275 S.W.3d 395, 404-05 (Tenn. 2009). In order to prevail on a challenge of this nature, the Defendant must demonstrate not only that a juror should have been removed for cause, but that he had exhausted all of his peremptory challenges. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993).

It is unclear from the record whether the Defendant used all of his allotted peremptory challenges during voir dire. However, based on Mr. Hurley's account of his personal knowledge of the Defendant, we agree with the Defendant that Mr. Hurley should have been excused for cause because this personal knowledge would have prevented him from serving as a fair and impartial juror on the Defendant's case. Our determination leads us to conclude that the trial court, when denying the Defendant's request to excuse

Mr. Hurley for cause, employed reasoning that caused an injustice to the Defendant and, thus was an abuse of discretion. *See Scott*, 275 S.W.3d at 404-05.

The Defendant is not, however, entitled to relief on this issue. First, he has not pointed to any evidence in the record showing how the victim's neighbor's presence on the jury prejudiced him or that the juror was in possession of any extrajudicial knowledge that prevented the juror from serving as a fair and impartial juror. Second, it is not clear from the record that the Defendant had exhausted his peremptory challenges and was therefore unable to exercise a peremptory challenge to excuse the victim's neighbor. It is the Defendant's obligation to present an accurate and complete record to this court. *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). The Defendant is not entitled to relief on this issue. The trial court's error was harmless under these circumstances.

### B. Thirteenth Juror

The Defendant next contends that the trial court failed to perform its function as the thirteenth juror or that it did so improperly. He alleges that the trial court stated that it had viewed the evidence presented in the light most favorable to the State, rather than make an appropriate independent judgment about the weight of the evidence as required in its role as the thirteenth juror by Tennessee Rule of Criminal Procedure 33. The application of the sufficiency standard was reversible error in *State v. Moats*, 906 S.W.2d 431 (Tenn. 1995) he argues, and thus, as in *Moats*, necessitates a new trial in this case. The State responds that the facts in this case differ significantly from those in *Moats*, and that the trial court properly performed its role and function as the thirteenth juror. We agree with the State.

*State v. Moats* provides us with a brief overview of the thirteenth juror rule:

The thirteenth juror rule originated at common law and requires the trial court to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence. *Curran v. State*, 157 Tenn. 7, 4 S.W.2d 957, 958 (1928). Specifically, in a criminal case "it is the duty of the trial judge to consider the weight of the evidence and determine whether or not it establishes . . . guilt beyond a reasonable doubt." *Manning v. State*, 155 Tenn. 266, 284, 292 S.W. 451, 457 (1927). . . . The thirteenth juror rule [at] subsection (f) of Tenn. R. Crim. P. 33, . . . provides:

New Trial Where Verdict Is Against the Weight of the Evidence.—The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. If the trial court grants a new trial because the verdict is contrary to the weight of the evidence, upon request

9

of either party the new trial shall be conducted by a different judge.

906 S.W.2d at 433-34. Our supreme court stated that "when a trial court chooses to comment on the record about its thirteenth juror determination, the ruling should be clear and unequivocal." *Id.* at 435. The trial court in *Moats* "did not believe that the weight of the evidence supported the jury's verdict," expressed "dissatisfaction or disagreement with the weight of the evidence or the jury's verdict" and/or made "statement indicating that the trial court misunderstood its responsibility or authority to act as the thirteenth juror" and thus a new trial was ordered.

The factors that led to a new trial being ordered in *Moats* are not present here. The trial court, at the motion for new trial hearing, stated that the evidence supported the verdict and "expressly approve[d] the verdict in its capacity as [thirteenth] juror." Accordingly, the trial court properly performed its role as thirteenth juror.

## C. Sufficiency of the Evidence

The Defendant lastly contends that the evidence is insufficient to support his conviction because the State relied on circumstantial evidence to establish his identity as the perpetrator and because several other individuals' DNA was present on the crime scene evidence. The State responds that the evidence is overwhelmingly sufficient to support his conviction for second degree murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with

10

guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000). A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial

evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987).

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210 (2014). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." § 39-11-302(b). "To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." *State v. Parker*, 350 S .W.3d 883, 904 (Tenn. 2011).

The evidence, considered in the light most favorable to the State, showed that the Defendant was home with the victim on the morning she died. The Defendant's wife saw him in the victim's room in the hours before her death. The Defendant's wife heard a scream and, when she questioned the Defendant about what had happened, he responded, from the victim's room, that the victim had fallen and that he would take care of her. He closed the door to her bedroom at that point. The victim was found hours later in her bedroom having been beaten to death. The day before her death, the Defendant sold the victim's jewelry for cash. Her debit card was found with her blood on it, inside her vehicle where the Defendant claimed to have placed it.

The victim's blood was found on the Defendant's clothes, and it was the Defendant who was last seen with the victim in the hours shortly before she died. The Defendant was present when the police responded to his call, but he admitted to failing to call the police immediately after he found her body. Later, the Defendant failed to follow instructions when told not to wash his hands. This is sufficient evidence from which a jury could have concluded beyond a reasonable doubt that the Defendant beat the victim to death inside her bedroom. We reiterate that circumstantial evidence can be sufficient to support a conviction. *See Tharpe*, 726 S.W.2d at 899-900. As such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

12