# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 23, 2001 Session

## STATE OF TENNESSEE v. DAVID SCARBROUGH

### Direct Appeal from the Criminal Court for Knox County
### No. 62279B     Ray L. Jenkins, Judge

---

### No. E1998-00931-CCA-R3-CD
### July 11, 2001

---

The defendant, David Scarbrough, was convicted of two counts of felony murder, two counts of theft, and aggravated burglary. The trial court imposed sentences of life imprisonment with the possibility of parole for each of the murders, a sentence of six years for the aggravated burglary and sentences of 11 months, 29 days for each of the thefts. All sentences are to be served consecutively. In this appeal of right, the defendant presents the following issues for review: (1) Whether the evidence was sufficient to support the convictions; (2) whether the defendant's statement to police was made knowingly and voluntarily; (3) whether the trial court erred by denying the defendant's challenge for cause of a juror; (4) whether the trial court erred by denying defendant's motion for continuance; (5) whether the trial court erred by refusing a jury instruction on facilitation of felony murder; (6) whether the trial court erred by admitting photographs of the crime scene; (7) whether the trial court erred by refusing to permit a private investigator to testify; (8) whether the trial court properly refused to allow the testimony of a psychologist during the guilt phase of trial; (9) whether the sentences were excessive; and (10) whether the trial court erred by denying the defendant's motion for a writ of error coram nobis based on newly discovered evidence. Because the trial court erred by failing to instruct on the lesser included offense of facilitation of felony murder and because such error was not harmless beyond a reasonable doubt, the felony murder convictions are reversed and the causes are remanded for a new trial. The remaining convictions are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed in Part and Reversed in Part.

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Leslie M. Jeffress and James H. Varner, Jr., Knoxville, Tennessee, for the appellant, David Scarbrough.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Randall E. Nichols, District Attorney General; William Crabtree, Assistant District Attorney General; and Jo Helm, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Shortly before 5:00 p.m. on February 4, 1995, Lieutenant Darrell Johnson of the Knox County Sheriff's Department was directed to investigate a double homicide at the residence of the victims, Lester and Carol Dotts, on Russfield Drive in Knox County. When he arrived at the scene, Lt. Johnson observed multiple gunshot wounds to each of the bodies. The screen door to the porch had been cut, a window pane had been broken, and the interior of the house had been ransacked. There were six .9 mm rounds recovered in the bedroom where Mr. Dotts's body was discovered. Lt. Johnson testified that one .9 mm round was recovered from Mr. Dotts's body, two from the bed rail and mattress, and two from underneath the carpet. There was a .9 mm round at the foot of the bed and a .38 caliber bullet on the floor. In the den area where Mrs. Dotts's body was found, police recovered a .9 mm round from the hallway, one from the bathroom scales, and one from the hall closet. The last .9 mm round, which traveled the length of the house, was found in the exercise/sewing room. Police also recovered nine shell casings from a .9 mm semiautomatic weapon. Lt. Johnson testified that six shell casings were found near Mrs. Dotts's body and three were found near Mr. Dotts's body. During the course of the investigation, Johnson came into contact with 13-year-old Harley Watts. Watts, who had been arrested for stealing cars, gave a statement to police which implicated the defendant and Thomas Gagne in the murders.

At trial, Watts, who by then had pled guilty in juvenile court to burglary and two counts of murder, testified that he was "riding around" Knoxville late at night with Gagne and the defendant, looking to break into parked automobiles. He recalled that Gagne drove to a "rich" neighborhood, stated his intention to burglarize one of the homes, and parked his vehicle at a dead-end street. He stated that Gagne and the defendant left the vehicle and he remained inside. When they hurriedly returned to the car about 30 minutes later, the defendant was carrying a .9 mm semiautomatic pistol, which he handed to Gagne as they drove away. Gagne then remarked, "somebody came out on [me] and [I] started shooting." According to Watts, Gagne later threw something out the window.

Dr. Sandra K. Elkins, Knox County Medical Examiner, testified that Mr. Dotts sustained five gunshot wounds and Mrs. Dotts was shot at least seven times. It was her opinion that both were alive when their wounds were inflicted.

Robert Edward Brykalski, the victims' son-in-law, testified that when he inventoried the victims' house after the crime, he discovered that several items were missing. Mr. Dotts's billfold, Mrs. Dotts's purse, and some 200 to 300 blank checks could not be found. Police later recovered the billfold and purse a short distance from the victims' house. Brykalski also testified that the victims were planning to go out to a restaurant on the night before their bodies were discovered, but had not left the house by 6:30 p.m.

John Raymond Jacobs, a rebuttal witness for the state, testified that he worked with the defendant at U-Haul truck rentals in the summer of 1996. He claimed that sometime after the murders, he and some other employees were telling "war stories" when the defendant admitted to killing a couple in West Knoxville.

Some five days after the crime, police arrested the defendant and charged him with possession of a .9 mm gun.[1] While the weapon, which was tested by the FBI, was not identified as the gun used in the homicides, the defendant, after consulting with his attorney at that time, Jeff Hagood, provided the police with an incriminating statement.

In his initial statement to law enforcement officials, the defendant acknowledged that he was with Gagne and Watts on the night of the murders. He stated that Gagne drove to the victims' neighborhood in order to "pick up some stuff" for his father. The defendant, who said he was smoking marijuana with Gagne at the time, speculated that they were looking for drugs. He claimed that Gagne, who had a nickel-plated .9 mm gun between the seats, stopped the car near the victims' residence and turned off the lights. The defendant stated that he and Watts remained in the vehicle while Gagne stepped outside and looked around for about five minutes. He described Watts as the "front watchman" who stayed in the car. While acknowledging that he and Gagne then walked to the rear of the victims' house, the defendant maintained that he stayed outside the residence in order to "watch" the backyard. He contended that he did not see how Gagne gained entry. The defendant recalled that some 15 minutes later, he heard a gunshot and "took off running" to the car. He suspected that Gagne had been shot. The defendant told police that he heard more gunshots as he ran toward the car, where he sat for "a minute." Gagne, he claimed, was right behind. They drove away without turning on the lights. The defendant recalled that Gagne remarked, "I had to do it." According to the defendant, Gagne drove Watts to his residence, removed the license tag from the car, and, presumably, added another in its place. In a second statement, the defendant admitted that he was in possession of the .9 mm gun when he left the vehicle. He claimed, however, that he gave the weapon to Gagne before they reached the victims' house.

At trial, the defendant denied any participation in the crime. He testified that he was pressured to give his statements to police because attorney Hagood had informed him that he would not be charged with murder if he cooperated. He explained that he had learned the details he reported to the police from Watts's statement and from newspaper articles. He testified that on the night of the murders, he and Kasey Keirsey, his girlfriend, were visiting his cousin, Michelle Bizak, and her husband Phillip. The defendant contended that he arrived at the Bizaks' house at about 8:00 p.m. and stayed until about 10:30 p.m. He claimed that he met Watts for the first time four days later.

Ms. Keirsey testified that she and the defendant had visited the Bizaks, but she could not remember the date. On cross-examination, however, she acknowledged that she could not have been with the defendant on the night of the murders because a calendar that she kept at that time indicated that she had gone to a school basketball game with two friends.

---

[1] The defendant was also charged with three counts of auto theft, three misdemeanor counts of possessing a weapon, simple possession of marijuana, and possession of drug paraphernalia. The charges were later dismissed.

Christy Ledford, one of Ms. Keirsey's friends, confirmed that the two had attended a school basketball game together on the night of the murder, February 3, 1995. She testified that she remembered the date because it was "Flannel Night" during the school's Spirit Week.

Both Phillip and Michelle Bizak testified that they remembered Ms. Keirsey and the defendant visiting their home. Neither could recall if the visit occurred on February 3, a Friday night, or February 4, a Saturday night.

The jury returned verdicts of guilt. Afterward, the trial court denied a motion for new trial and the defendant filed a notice of appeal. Eleven months later, the defendant petitioned the trial court for a writ of error coram nobis based upon the statement of Robert Manning, a Tennessee inmate, who confessed to the burglary and murder of the victims. In his statement, Manning also implicated Eric Steyer, a Michigan inmate. At the hearing, however, Manning declined to answer any questions concerning the crimes. Steyer, who was also called as a witness, testified that he had never committed a criminal offense with Manning. Shannon Langdon, Steyer's wife, testified that Steyer had informed her that he and Manning did burglarize and murder the victims. Steyer denied having made the statement. The trial court denied the writ of error coram nobis and the defendant appealed. This court granted a motion to consolidate the appeals.

I

Initially, the defendant asserts that there was insufficient evidence to support his convictions for felony murder, aggravated burglary and theft. He maintains that, given the lack of physical evidence and the various discrepancies in the testimony, a rational trier of fact could not have found him guilty beyond a reasonable doubt on any charge. We disagree.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). A guilty verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in the proof in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

A person commits the offense of aggravated burglary when he enters a habitation with intent to commit a felony, theft or assault. Tenn. Code Ann. § 39-14-403(a) (1997). A person commits first degree felony murder when he commits a killing in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy. Tenn. Code Ann. § 39-13-202(a)(2) (1997). A person commits theft when he

knowingly obtains or exercises control over property without the owner's consent and with the intent to deprive the owner of the property. Tenn. Code Ann. § 39-14-103 (1997).

Here, there was proof that the victims sustained multiple gunshot wounds. Authorities found numerous shell casings and spent bullets from a .9 mm gun next to the bodies. Lieutenant Johnson testified that the screen door at the rear of the house had been torn or cut, that a window frame had been knocked inside, and that the victims' house had been "ransacked." Watts testified that the defendant and Gagne left the vehicle together after Gagne had announced that they were going to break into a house. About one-half hour later, when the defendant and Gagne hurriedly returned to the car, the defendant was holding a .9 mm gun. The defendant acknowledged to police that he left the vehicle with the .9 mm gun, provided Gagne with the weapon, and then watched the backyard as Gagne entered the Dotts's residence. He heard at least one gunshot before returning to the car. While the defendant claimed at trial that he was at his cousin's house with Ms. Keirsey on the night of the murders, his alibi witnesses could not fully corroborate his claim. In fact, both Ms. Keirsey and her friend, Christy Ledford, testified that Ms. Keirsey could not have been with the defendant on the night of the murder because she was at a school basketball game.

Taking the facts in a light most favorable to the state, it is our conclusion that a rational trier of fact could have found that the defendant intended to break into the victims' residence and, at the very least, acted as a lookout with full knowledge that Gagne was burglarizing the victims' home. In either event, the defendant could be held accountable for the burglary. Items of value were removed from the Dotts's residence. Furthermore, a rational trier of fact could have found that the victims were killed in the perpetration of that offense. Those murders were, in our view, a natural and probable consequence of the underlying felony. Moreover, immediately after the murders, the defendant was seen in possession of a .9 mm weapon. There were six .9 mm rounds and three .9 mm shell casings recovered near the body of Mr. Dotts. At least four .9 mm rounds and six .9 mm shell casings were recovered near the body of Mrs. Dotts. All of these circumstances suggested that the defendant may have actually participated in the murders.

The defendant also argues that the testimony of Watts should have been discredited because it was riddled with inconsistencies. In particular, he maintains that it was unlikely that the testimony of Watts was accurate because Dr. Elkins testified that the victims had eaten a full meal no less than two hours prior to their deaths and because Watts testified that the defendant committed the crimes at around 2:00 a.m. The defendant reasons that because Brykalski testified that the victims were planning to go out for dinner shortly after 6:30 p.m., it is unlikely that an elderly couple would have waited to eat dinner until near midnight. While this evidence was not necessarily inconsistent, the jury has the prerogative to resolve conflicting testimony. In this case, it did so in favor of the state's theory. In our view, a rational trier of fact could have appropriately returned guilty verdicts on each of the charges.

## II

Next, the defendant argues that his statements to police should have been suppressed by the trial court. He contends that the statements were not made knowingly and voluntarily because of the

ineffective assistance of his counsel. He also contends that the statements should be excluded because they were provided in exchange for a false promise of leniency.

It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. Yet, this court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order for an accused to effect a waiver, he must be adequately appraised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

At the suppression hearing, the defendant's first attorney, Jeff Hagood, testified that he was contacted by a deputy from the sheriff's department who informed him that the defendant was a suspect in the murder of the victims; he then "passed on" the information to the defendant, who denied any involvement. Attorney Hagood testified that he later requested a meeting with the defendant and his parents when he learned that a juvenile had implicated the defendant in the murders. In meetings which included his parents, the defendant acknowledged that he was with Gagne and Watts on the night of the murders, but he claimed that he only "watched" the backyard. The attorney testified that he then talked with the prosecutor's office about leniency in exchange for a statement. While nothing specific was ever resolved, he concluded that the defendant would be given "consideration" if he gave a truthful statement. Attorney Hagood, who was present during each of the defendant's two statements, testified that he believed "consideration" meant something less than a murder charge. The defendant was advised of his Miranda rights and executed a waiver.

At the suppression hearing, Assistant District Attorney William Crabtree testified that neither he nor others in his office offered to "take care" of the defendant. He confirmed, however, that he informed the defendant that he would be given consideration in exchange for help in solving the murders. Randall E. Nichols, District Attorney General, testified that he met with the defendant and

made it known that if the defendant cooperated and gave a truthful statement, the sentencing judge would be informed of his cooperation. He maintained, however, that he neither used the term "leniency" nor discussed possible immunity.

At the hearing, the defendant testified that he made the statement to police because his attorney believed that "it was in [his] best interest." It was the defendant's belief that he would be given a "substantial amount" of leniency and would not be charged with murder. On cross-examination, however, the defendant admitted that he could not identify anyone who had represented that he would not be charged with murder if he gave a truthful statement.

Initially, the defendant argues that his statements came as the result of mistaken advice from his counsel. He maintains that counsel's advice to give a truthful statement to police was erroneous because the statement provided the necessary corroboration of accomplice testimony. The defendant contended that his counsel had failed to conduct any investigation before offering such unwise advice.

In denying the motion to suppress, the trial court ruled as follows:

[During] the first statement . . . [t]he defendant was not in custody and was not restrained. . . . [T]he second statement was given in the office of the defendant's attorney. Again there was no arrest.

Under the totality of the circumstances, whether the statements given were true or false makes no difference. The fact remains that both were voluntary.

There was no action on the part of the State physically or mentally coercing the defendant. If the . . . information given by the defendant to his attorney resulted in erroneous advice, he at least is partially responsible.

The result is that the statements are admissible.

We must concur. First, the evidence does not preponderate against the trial court's determination that the defendant's waiver was voluntary. The defendant was not in custody when he made the statements to police. In Miranda, the United States Supreme Court limited its holding to "custodial interrogation." Miranda, 384 U.S. at 478-79. The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. A person is "in custody" within the meaning of Miranda if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on

-7-

freedom of movement" of the degree associated with a formal arrest). Here, the defendant was not arrested until long after his statements and there is no evidence that he was ever restrained or coerced. Even if there had been a custodial interrogation, the record establishes that the defendant read his Miranda rights before making each statement and waived those rights after consultation with his attorney.

Second, the record does not support the defendant's claim that his attorney gave erroneous advice. Attorney Hagood testified that after he learned that Watts had implicated the defendant, he met with the defendant and his parents on several occasions. He testified that the defendant maintained his innocence until he learned from the sheriff that Gagne was going to make a statement implicating the defendant. The record indicates that Attorney Hagood then advised the defendant that if Watts's statement was accurate, he should consider making a truthful statement to police. The next day, the defendant acknowledged to his attorney that he was involved in the crimes. Attorney Hagood testified that it was the defendant's decision to give each statement. The record does not support the defendant's claim that someone in the district attorney's office promised him that he would not be charged with murder if he gave a truthful statement. Even if the district attorney had promised to consider leniency, that would have necessarily depended upon the extent of his involvement in the crimes and the degree of his candor in talks with the investigating officers.

Had it been erroneous for his attorney to advise cooperation with the police due to a lack of independent investigation, the defendant's Fifth Amendment right to counsel was not implicated because the interrogations were not custodial. See Edwards v. Arizona, 451 U.S. 477, 81-82 (1981); State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). Nor had the defendant's right to counsel under the Sixth Amendment attached. A defendant's Sixth Amendment right to effective assistance of counsel attaches when "formal adversary judicial proceedings" begin. Moore v. Illinois, 434 U.S. 220 (1977); Kirby v. Illinois, 406 U.S. 682 (1972). In this state, the initiation of adversary proceedings begins with a formal charge such as an arrest warrant, indictment, or presentment, or, in cases where there is no formal warrant, a preliminary hearing. State v. Bryan, 990 S.W.2d 231, 239 (Tenn. 1998) (citing State v. Mitchell, 593 S.W.2d 280 (Tenn.), cert. denied, 449 U.S. 845 (1980)). A defendant cannot prevail on an ineffective assistance of counsel claim when the constitutional right has not attached. See Wainwright v. Torna, 455 U.S. 586 (1982). Here, the defendant had not been charged at the time he gave the statements to the investigating officers.

The defendant next contends that his statement was not made voluntarily because it came as the result of promises of leniency. In addressing the state's offer of "leniency," the trial court held as follows:

> [T]he State v. Baker case, 931 S.W.2d 232, at page 236 . . . seems to have brought the law together. . . . The Court states: "In order to render the statement involuntary, the defendant must have been 'gripped by the hope of leniency' and, as a result, was not able to choose freely and rationally among the courses available to him . . . . The offer of leniency must be clearly understood to be a guarantee, and the defendant's will to resist must have been critically impaired . . . . From all of this, we conclude

that any promise of benefit was of a general nature and did not overcome his 'free and rational choice.' "

        I think that's exactly the situation we have here, resulting in the denial of the motion to suppress.

We agree. There is no proof that the defendant was ever offered a specific favorable plea proposal in exchange for his statements. District Attorney Nichols described "consideration" as merely informing the sentencing judge of the defendant's cooperation. The defendant's attorney, who had hoped for a more formal agreement, nevertheless confirmed that the district attorney's office had never offered a specific agreement. To render a statement involuntary, an offer of leniency must be clearly understood to be a guarantee and the defendant's will to resist must have been critically impaired. State v. Baker, 931 S.W.2d 232, 235 (Tenn. Crim. App. 1996). The evidence here did not rise to that standard.

### III

Next, the defendant claims that the trial court erred by refusing to remove a juror for cause. He claims that Juror Sheely should have been excused because of her exposure to potentially prejudicial information and her inability to fairly consider the evidence. Defense counsel moved to strike Juror Sheeley after the following series of questions and answers:

[DEFENSE COUNSEL]: When did you first learn about the crime that we're talking about here? Do you recall?

MS. SHEELEY: . . . I don't know how long I've been reading [about] it.

[DEFENSE COUNSEL]: Okay. What do you recall specifically, if you recall anything specifically, about the case?

MS. SHEELEY: That someone went in this house and killed these older people .

\*\*\*

[DEFENSE COUNSEL]:. . . [O]ther than Mr. Gagne, are you aware of any other persons who are – have been suspected in this case, know who they are?

MS. SHEELEY: No, no.

\*\*\*

[DEFENSE COUNSEL]: Anyway, from what you've read, have you reached any kind of conclusion about –

MS. SHEELEY: No.

[DEFENSE COUNSEL]: – these people, about whether they might be guilty or not guilty?

MS. SHEELEY:  No.

Following the examination of juror Sheeley, which was out of the presence of prospective jurors, questions were posed to the entire panel:

[DEFENSE COUNSEL]:. . . You've already heard from [the prosecutor] that you're going to hear a videotaped statement from [the defendant] . . . .  We expect to present proof, ladies and gentlemen, that that statement, when made, wasn't accurate, that that statement today isn't accurate . . . .  Is there anybody that, knowing that [the defendant] made a statement to the authorities different from what you're going to hear from some of our evidence in this case, that on that basis alone would say, I don't think I can consider the other evidence? . . .

MS. SHEELEY[]:  I can consider it, but I would be very sceptable (sic) of it.  That's the word I was thinking of.

\*\*\*

[DEFENSE COUNSEL]:  So – Ms. Sheeley . . . are you saying it would take a lot of proof to convince you differently?

\*\*\*

M[S]. SHEELEY:  (Nodded affirmatively)

\*\*\*

[DEFENSE COUNSEL]:  Ms. Sheeley, can you . . . [c]onsider all that evidence before you make up your mind?

MS. SHEELEY:  Yes.

\*\*\*

[DEFENSE COUNSEL]:  . . . How many of you feel you'd be more inclined to believe a police officer, a Sheriff's deputy, than you would someone else who gets up and testifies?

MS.  SHEELEY:  I've been taught to respect policemen, since I was just little.

\*\*\*

[DEFENSE COUNSEL]: Well, I expect the judge is going to charge that you must consider all of the testimony of the witnesses and not give anybody any special weight, other than that which you believe it should be given.  If the judge were to tell that they're not entitled to any special weight just because of their employment, could you follow that law?

MS. SHEELEY:  (No verbal response.)[2]

---

[2] A bench conference at the end of this questioning indicated that the trial judge considered the juror's answer to be an affirmative response.

Article 1, section 9 of the Tennessee Constitution guarantees "the right . . . to a speedy public trial . . . [by] an impartial jury." "The challenge for cause was designed to exclude from the jury triers whose bias or prejudice rendered them unfit. . . ." Manning v. State, 155 Tenn. 266, 292 S.W. 451, 455 (1927). Rule 24(b) of the Tennessee Rules of Criminal Procedure provides that "[i]f the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case. . . ." One party may challenge a prospective juror for cause if the "prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(b)(2). The rule further provides as follows:

> Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Id.

Juror qualification rests within the discretion of the trial court and "the trial judge's finding a juror to be qualified will not be disturbed on review except on the clear showing of an abuse of discretion." Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979).

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented in court." State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). The United States Supreme Court has made the following observation:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961).

-11-

Thus, so long as a juror can set aside any previously formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case. Id. While juror Sheeley initially indicated that she had read about the murder of the victims and Gagne's involvement in the newspaper, she also asserted that she had no knowledge of the defendant's alleged involvement and had formed no opinion about his guilt.

The defendant also argues that juror Sheeley should have been removed because of the following exchange:

[PROSECUTOR]: . . . And can you also tell the judge that you wouldn't communicate [the newspaper] information to your fellow jurors?

MS. SHEELEY: I wouldn't – I would do what you tell me to.

[PROSECUTOR]: Thank you very much.

MS. SHEELEY: Or try to.

The defendant maintains that the response that the juror would "try" not to reveal information to fellow jurors was not unequivocal or resolute. The juror's initial response, however, to the prosecutor's question establishes that she understood her obligation not to pass along her information to the other jurors. Her qualification of that statement by the use of the word "try" would not, standing alone, warrant exclusion from the jury for cause.

The defendant also argues that the juror was biased because she stated that it would take "a lot of proof" to convince her that the defendant's evidence was true and that she would be more susceptible to testimony from police officers. The trial court ruled that the juror had resolved any concern about her partiality when she specifically agreed to discharge her duties in accordance with the instructions. The juror also acknowledged her duty to consider all of the evidence before making up her mind and provided assurances that she had no opinion as to guilt. In our view, the trial court did not err by declining to remove the juror for cause.

IV

Next, the defendant argues that the trial court erred by denying his motion for continuance. He maintains that the trial court should have granted an adjournment in order to locate a missing witness.

About a month before trial, the defendant moved for a continuance, arguing as follows:

Counsel have been recently advised by a potential witness that persons other than the defendant were involved in the alleged burglary and murders which are the subjects of this case. During the past ten days, this witness has provided specific details

-12-

concerning the crime scene, some of which were not made available to the public but upon review of discovery provided by the State, have proved accurate.

After the suppression hearing, the trial court denied the defendant's continuance motion on the basis that the defendant had failed to establish justification therefor. Near the close of the defendant's proof, defense counsel moved for an extended recess because the Knox County Sheriff's Department had been unable to locate Shannon Langdon, who had informed both defense investigators and law enforcement officials that her husband, Eric Steyer, and Robert Manning had committed the burglary and the murders. The defense asked that the trial court adjourn the proceedings in order to go through the necessary procedures to transport Steyer, who was incarcerated in a Michigan prison. The defense also sought the opportunity to require Langdon's appearance as a witness in the event Steyer either refused to testify on Fifth Amendment grounds or denied involvement in the crimes. The trial court ruled that the motion was late and deficient.

The grant or denial of a continuance motion rests within the sound discretion of the trial judge. His determination will not be overturned unless there is a clear showing of abuse of that discretion. Woods v. State, 552 S.W.2d 782 (Tenn. Crim. App. 1977); Frazier v. State, 466 S.W.2d 535 (Tenn. Crim. App. 1970). When there has been lack of diligence or neglect on the part of the moving party, the motion for continuance should be overruled. State v. Jefferson, 529 S.W.2d 674 (Tenn. 1975). A reversal is warranted only when the failure to continue results in an unfair trial and a different result might reasonably have been reached had the continuance been granted. Maxwell v. State, 501 S.W.2d 577 (Tenn. Crim. App. 1973).

When seeking a continuance due to the unavailability of a witness or evidence, the defendant must file a written motion setting forth the basis for the continuance and must file an affidavit alleging:

> (a) the substance of the facts that the [defendant] expects to prove through the unavailable witness or evidence, (b) sufficient facts to establish the relevance and materiality of the testimony or the evidence, (c) the testimony of the witness or evidence would be admissible, if available, (d) the testimony or evidence is not merely cumulative to other evidence, (e) the witness or evidence will be available at a later date, and (f) diligence was exercised to obtain the presence of the witness or evidence.

State v. Bennett, 798 S.W.2d 783, 787-88 (Tenn. Crim. App. 1990) (footnotes omitted). "As a general rule, mere conclusory allegations or opinions, standing alone, are insufficient to support the granting of a continuance." Id. at 788.

At the outset, it is unclear whether the defendant challenges the denial of the pretrial motion for continuance or the denial of a similar motion which occurred during the latter stages of trial. In either case, we cannot say that the trial court abused its discretion. The defendant's pretrial motion was not accompanied by an affidavit setting forth the facts the defendant intended to prove through

the unavailable witness, sufficient facts to establish the admissibility of any testimony, or the witness's availability at a later date.

We are also unpersuaded by the argument in support of the motion for adjournment. According to defense counsel, Langdon had indicated that if called to testify, she would exercise her right to remain silent. There is no indication in the record as to how long it would take to locate Langdon, whether her testimony would have been available if she were located, or the quantity or quality of her testimony. Furthermore, the defendant knew about Steyer long before trial and knew that he was in a Michigan prison. There is, however, no evidence that the defendant ever took the necessary steps under Tennessee Code Annotated § 40-17-211 (which details the procedure whereby prisoners can be witnesses if they are confined in another state) to call Steyer as a witness in this case. Finally, the record also suggests that even if Steyer had been called as a witness, he would have denied any involvement in the burglary and homicides. Thus, the trial court did not abuse its discretion.

V

Next, the defendant contends that the trial court erred by failing to instruct the jury on the lesser included offense of facilitation of felony murder. He argues that the evidence would have been sufficient to support conviction.

The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). There is an obligation "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). Pursuant to our statute and case law interpretations, defendants are entitled to jury instructions on all lesser offenses for which the evidence would support conviction. Complete instructions allow the jury to determine among each alternative the appropriate offense, if any, for conviction and to more evenly balance the rights of the defendant and the state. It is only when the record is devoid of evidence to support an inference of guilt of the lesser offense that the trial court is relieved of the responsibility to charge the lesser crime. Stephenson, 878 S.W.2d at 549-50; State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990).

First degree felony murder is the killing of another committed in the perpetration of or the attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy. Tenn. Code Ann. § 39-13-202(a)(2) (1997). Facilitation occurs when a person, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), knowingly furnishes substantial assistance in the commission of the felony. Tenn. Code Ann. § 39-11-403(a) (1997). Facilitation of an offense is, as a matter of law, a lesser included offense of the offense charged. State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999).

The guiding principle in determining whether to instruct on a particular lesser included offense is that if there is evidence in the record from which the jury could have concluded that the lesser included offense was committed, there must be an instruction for the offense. See Johnson

v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In Burns, our supreme court adopted a two-step process in determining whether the evidence justifies a jury instruction on a lesser included offense:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgements on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469.

Here, the trial court held that there was no proof to justify a charge of facilitation of felony murder because the defendant claimed alibi as his defense. It is our conclusion, however, that the evidence meets both the first and second prongs of the Burns test. In his statement to police, the defendant admitted that he went onto the victims' property because Gagne intended to pick up something for his father. The defendant acknowledged that Gagne parked away from the victims' driveway, "behind the bushes." He admitted that he was in possession of a .9 mm gun when the two left the car. After giving Gagne the weapon, he "watched" the backyard while Gagne made his way inside the residence. The defendant insisted that he did not enter the residence and could not see Gagne break inside. Viewing this in the light most favorable to the defendant and without making judgments on credibility, it is our assessment that reasonable minds could have rejected the alibi defense and accepted this statement as sufficient evidence of the lesser included offense of facilitation. Facilitation requires that a person know that another intends to commit a specific felony and that he knowingly furnish substantial assistance in the commission of the felony. See Tenn. Code Ann. § 39-11-403(a) (1997). Here, the crime took place at night in an upscale neighborhood. The defendant, who made no mention of whether he was aware of Gagne's intentions, acknowledged that he accompanied Gagne into the backyard and acted as a lookout while Gagne apparently went inside. Viewed liberally, as required by law, it is our conclusion that there was evidence of facilitation and that the evidence would have been legally sufficient to support a conviction for the lesser included offense. While an alternative theory of "criminal responsibility [for] knowingly furnish[ing] substantial assistance" in the felony, see Tenn. Code Ann. § 39-11-403(a), is inconsistent with an alibi defense, it is the duty of the jury to ascertain the facts and determine the credibility of the witnesses. Trial courts should not remove that fact-finding responsibility from the jury.

Even though the defendant challenged the admissibility of his pre-trial statement, refuted the veracity of its content, and claimed an alibi, the statement was submitted to the jury as an important part of the state's proof-in-chief. It is the exclusive duty of the jury to resolve conflicting accounts in the testimony and it is the jury's prerogative, when the proof is sufficient, to render a guilty verdict on either the crime charged or its lesser included offense. The trial court did not allow the jury to consider its various options. Because the evidence here would have supported a conviction either

for felony murder, the charge in the indictment, or for facilitation of felony murder, this court must conclude that there was error.

In State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court indicated that the right to instructions on lesser offenses was based upon the statutory requirement. Little reference was made to whether the right was also founded in our state constitution. In consequence, the high court directed that any error in the omission of a lesser included offense would be subject to the following harmless error analysis:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

Id.

In State v. Bolden, 979 S.W.2d 587 (Tenn. 1998), the defendant, who was charged with premeditated first degree murder, was willing to gamble on an "all or nothing" verdict by asking the trial judge not to charge the lesser included offense of second degree murder; the trial judge refused and the defendant was convicted on that lesser crime. While our supreme court affirmed that second degree murder conviction, its opinion emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction of the lesser offense." Id. at 593. Our supreme court also acknowledged that a "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment [and to] facilitate[] the overall truth-seeking function of the process." Id. If the failure to charge a lesser included offense was an error of constitutional dimension, as Bolden implied, the proper question would have been whether the error was harmless beyond a reasonable doubt. In State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000), however, our supreme court followed the rationale in Williams and held that reversal was required only "if the error affirmatively affected the result of trial, or if the error more probably than not affected the judgment to the defendant's prejudice." The high court concluded that the trial court's failure to instruct misdemeanor assault as a lesser included offense of the primary charge, aggravated sexual battery, was harmless error under Tenn. R. Crim. P. 52(a).

Recently, in State v. Ely, our supreme court clarified the holding in Williams and ruled that the failure to charge a lesser included offense indeed qualifies as an error of constitutional proportion:

> [T]he right of trial by jury is of constitutional dimension [as] evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider all offenses supported by the evidence.

Ely, slip op. at 17 (emphasis in original). Our high court directed that in reviewing error arising from a failure to charge one or more lesser included offenses, "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Id.

By use of the Williams standard, we would have concluded that the trial court's failure to charge facilitation of felony murder did not affect the verdict to the prejudice of the defendant. Under the traditional constitutional error standard set forth in Ely, however, this court cannot conclude that the error was harmless beyond a reasonable doubt. Had the jury been instructed on facilitation to commit murder, the evidence would have been sufficient, as previously indicated, to support a verdict of guilt. In his statement to police, the defendant maintained that while Watts was a "front watchman," he stayed in the backyard and acted as a lookout for Gagne who walked toward the victims' residence. The defendant claimed that Gagne was there to participate in a drug transaction. The circumstances suggested a burglary. The defendant implied that he was surprised to hear gunshots and, out of fear, quickly retreated to the getaway vehicle. He told police that Gagne claimed to have fired shots only because "somebody came out on him." The term "moral certainty" is often described as required to resolve reasonable doubt. Workman v. Bell, 178 F.3d 759 (6th Cir. 1998); Coe v. Bell, 161 F.3d 320 (6th Cir. 1998). By the use of the reasonable doubt standard, this court could not declare with moral certainty that the jury, if properly instructed, would not have returned a guilty verdict for facilitation of felony murder. See Chapman v. California, 386 U.S. 18 (1967).

A concurring opinion authored by Chief Justice Rehnquist in Sullivan v. Louisiana describes the duty of the appellate court in circumstances where there is constitutional error:

> [T]he reviewing court is usually left only with the record developed at trial to determine whether it is possible to say beyond a reasonable doubt that the error did not contribute to the jury's verdict. . . . [A]ny time an appellate court conducts harmless-error review it necessarily engages in some speculation as to the jury's decisionmaking process; for in the end no judge can know for certain what factors led to the jury's verdict.

508 U.S. 275, 283 (1993) (Rehnquist, J., concurring).

In Fahey v. Connecticut, 375 U.S. 85 (1963), our highest court observed that the real question when there is a constitutional violation is whether there is "a reasonable possibility" that error might have contributed to the conviction. In Chapman, our Supreme Court approved of that language and further concluded that when constitutional error had occurred, appellate courts had the obligation "to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. If allowed the alternative, facilitation of first degree murder, there is a "reasonable possibility" that the jury may have convicted on that offense. While perhaps not entirely probable under these facts, there is that rational possibility. Accordingly, the defendant is entitled to a new trial.

# VI

Next, the defendant claims that the trial court abused its discretion by allowing certain photographs to be introduced into evidence. He specifically argues that "gory" photographs of the crime scene introduced by Officer Johnson should not have been admitted because any probative value they possessed was substantially outweighed by the danger of unfair prejudice.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 of the Tennessee Rules of Evidence, however, provides that relevant evidence may be excluded in certain situations:

> Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Simply because a photograph is prejudicial does not mean that it must be excluded as a matter of law. See State v. Gentry, 881 S .W.2d 1, 6 (Tenn. Crim. App. 1993). The court must still determine the relevance of the photograph and weigh its probative value against any undue prejudice.

In State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court recognized "the inherently prejudicial character of the photographic depictions of a murder victim . . . ." In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge. The "value of photographs as evidence, . . . their accuracy and clarity, . . . [and] the inadequacy of testimonial evidence in relating the facts to the jury" are appropriate factors. Id. The admissibility of relevant photographs of the victim is within the sound discretion of the trial judge and his or her ruling will not be disturbed on appeal absent a clear showing of an abuse of that discretion. Id. at 949.

Initially, the record establishes that this defendant objected only to those photographs that dealt with the bloody clothing of the victims, 10 of the 32 photographs introduced during Officer Johnson's testimony. Failure to make a contemporaneous objection to the other 22 photos is a waiver of the issue on appeal. See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). The 10 photographs to which the defendant objected were not included in the record on appeal. It is the defendant's responsibility to present a fair, accurate, and complete record for review, else the issue is waived. State v. Galloway, 696 S.W.2d 364 (Tenn. 1985); State v. Bunch, 646 S.W.2d 158 (Tenn. 1983). Any error due to the admission of the 32 photographs has, therefore, been waived.

VII

Next, the defendant argues that John Edward Rucker, a private investigator, should have been allowed to testify. He submits that he should have been allowed to rebut testimony offered by an alibi witness in order to establish the actual date that the defendant and Ms. Keirsey visited the Bizaks.

At trial, Ms. Keirsey testified that she visited the defendant's cousin's home in February of 1995 with the defendant, but could not remember the exact date. On cross-examination, Ms. Keirsey reviewed her activities calendar and concluded that she was at a school basketball game with friends on the night of the murders. After the Bizaks testified that they were uncertain of the exact date that the defendant and Ms. Keirsey came to their house, the defendant called Rucker as a witness. The state objected. During the bench conference, defense counsel explained that Rucker would testify regarding Ms. Keirsey's previous statement to him that she was with the defendant at the Bizaks' house on the night of February 3, 1995. Because Ms. Keirsey had not been asked about the statement, the trial court sustained the objection.

In our view, the trial court correctly excluded Rucker's testimony. Generally, extrinsic evidence of a prior inconsistent statement is inadmissible except under the terms of Tennessee Rule of Evidence 613, which provides in pertinent part as follows:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. . . .

Tenn. R. Evid. 613(b); see also State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982). The purpose of Rule 613(b) is to allow introduction of otherwise inadmissible extrinsic evidence for impeachment. State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). A prior inconsistent statement introduced for purposes of impeachment may be considered only on the issue of credibility and not as substantive evidence. Reece, 637 S.W.2d at 861. Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally acknowledges having made the prior statement. Martin, 964 S.W.2d at 567. When presented with a prior inconsistent statement a "witness has several possible responses: the witness can admit, deny, or not remember making all or part of the statements." Neil P. Cohen et al., Tennessee Law of Evidence § 6.13[5][a] (4th ed. 2000). If the witness admits making the prior inconsistent statement, any extrinsic proof of the statement would be cumulative. Id.

At trial, defense counsel did not question Ms. Keirsey about her prior inconsistent statement to Rucker. She had no opportunity, therefore, to admit, deny, or otherwise explain the statement. Likewise, the state was not afforded an opportunity to interrogate Ms. Keirsey about the statement. The requirements of Tennessee Rule of Evidence 613(b) are clear. Because they were not met in this case, the trial court properly excluded Rucker's testimony.

The state also argued that Rucker should not be allowed to testify because he was in the courtroom during testimony. At the request of the defendant, the trial court had ordered sequestration of the witnesses before voir dire. Although the defendant maintained that Rucker was not present during Ms. Keirsey's testimony, the trial court did not allow him to testify:

> The [sequestration] rule doesn't say anything about compartmentalizing the testimony so as to permit one witness to stay in during testimony he's not going to contradict.
>
> ***
>
> [W]here the parties insist on sequestration of the witnesses, they are charged with the responsibility of keeping their witnesses outside the courtroom.

Rule 615 of the Tennessee Rules of Evidence provides:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before voir dire, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The sequestration rule prevents witnesses from hearing testimony of other witnesses and subsequently adjusting testimony. See State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). Various sanctions exist for violations of the rule. A trial judge may declare a mistrial or preclude a witness from testifying in the most egregious cases. State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). However, the witness may be cross-examined regarding the violation and the jury may be instructed to consider the violation in assessing the witness's testimony. Id. When the issue of a violation of the "rule" is raised on appeal, this court considers the seriousness of the violation and the prejudice, if any, suffered by the defendant. Harris, 839 S.W.2d at 68-69; Anthony, 836 S.W.2d at 605.

Here, Rucker was called as a witness in order to rebut Ms. Keirsey's testimony concerning the date of the visit to the Bizaks' home. According to Rule 615 of the Tennessee Rules of Evidence, a trial court can make an exception to the sequestration rule for rebuttal witnesses. Such an exception, however, requires a dual showing of genuine surprise and demonstrable need. See Tenn. R. Evid. 615, Advisory Commission Comment. In our view, the defendant has shown both. During the bench conference, the defendant maintained that Ms. Keirsey's testimony, which included reference to her calendar, came as a surprise and that prior to her testimony, he had no plans to call

Rucker as a witness. It is also clear that there was a demonstrable need for Rucker's testimony, because Ms. Keirsey's expected testimony was material to the defendant's alibi. We cannot say, however, that the trial court's refusal to let Rucker testify was prejudicial in light of other overwhelming evidence, including the testimony of the Bizaks, the testimony of Watts, the defendant's statements to police and the testimony of Christy Ledford, Ms. Keirsey's friend, who confirmed that she attended the school basketball game with Ms. Keirsey on the night of the murders. Reversal is required only if the error affirmatively appears to have affected the result of the trial on the merits, or, in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice. See Tenn. R. Crim. P. 52(a); see Tenn. R. App. P. 36(b).

VIII

Next, the defendant argues that the trial court erred by excluding the testimony of Harold Wagner, a clinical psychologist, regarding his mental state. In particular, the defendant argues that the psychologist's testimony would have substantially assisted the jury to understand why the defendant had made false statements to the police. In response, the state maintains that the determination of the weight and credibility of the defendant's testimony is a matter entrusted exclusively to the trier of fact, that the jury needed no assistance, and that the trial court properly excluded the testimony.

According to the defendant, the psychologist was expected to testify that the defendant tended to follow the lead of a strong male personality, which would have "assisted" the jury in understanding why he made false statements to police. The defendant did not make a proffer of the psychologist's testimony because Dr. Wagner refused to provide the state with the materials he used in reaching the evaluation.

Our supreme court addressed an analogous issue in State v. Ballard, 855 S.W.2d 557 (Tenn. 1993). In Ballard, the court held that expert testimony offered by the state concerning symptoms of post-traumatic stress syndrome exhibited by victims of child abuse was inadmissible. Id. at 563. In reaching this conclusion the court reasoned as follows:

> In the context of the criminal trial, expert scientific testimony solicits the danger of undue prejudice or confusing the issues or misleading the jury because of its aura of special reliability and trustworthiness. This "special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice a defendant's cause by encouraging a jury to conclude that because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime. Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are "not like a fingerprint in that it can clearly

-21-

identify the perpetrator of a crime." Expert testimony of this type invades the province of the jury to decide on the credibility of witnesses.

Id. at 561-62 (citations omitted).

Similarly, in State v. Coley, 32 S.W.3d 831 (Tenn. 2000), our supreme court ruled that the trial court properly excluded expert testimony, proffered by the defendant, concerning the reliability of eyewitness testimony. It concluded that such testimony was inadmissible per se, as it was of a general nature rather than specific to a particular eyewitness, and was designed to influence the jury's assessment of the credibility of witnesses. Id. at 834.

In State v. Shuck, 953 S.W.2d 662 (Tenn. 1997), our supreme court ruled that the trial court's exclusion of expert testimony regarding the defendant's susceptibility to being led by others was reversible error. In Shuck, however, the proffered expert testimony was relevant to the defense of entrapment. Our supreme court distinguished expert testimony relating to witness credibility, which "is not reliable proof as to the question of whether a defendant committed the specific crime of which he or she is accused." Id. at 669; cf. State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997) (holding that expert psychiatric testimony is admissible to establish that a defendant lacked the capacity to form the requisite culpable mental state to commit the offense charged).

Here, as in Ballard and Coley, this court is presented with testimony designed to affect the jury's assessment of witness credibility. Using the Ballard rationale, expert testimony concerning personality types "solicits the danger of undue prejudice or confusing the issues or misleading the jury . . . ." Ballard, 855 S.W.2d at 561; see also Tenn. R. Evid. 403. In consequence, such testimony might "lead a jury to abandon its responsibility as fact finder and adopt the judgment of the expert," rather than "assist" the jury in making its own determination of credibility. See id. In our view, the exclusion of the testimony was proper.

IX

Next, the defendant argues that the trial court erred in calculating the lengths of his sentences for the aggravated burglary, six years, and for the two thefts, 11 months, 29 days each. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel

relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

A. Aggravated Burglary

In calculating the sentence for aggravated burglary, a Class C felony conviction, the presumptive sentence is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the minimum, but still within the range. Tenn. Code Ann. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

For a Range I offender, the possible range for the offense of aggravated burglary is from three to six years. Tenn. Code Ann. § 40-35-112(a)(3).

The trial court found the following enhancement factors applicable to the aggravated burglary offense:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

(3) The offense involved more than one (1) victim;

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability . . . ;

(5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(6) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

***

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high;

***

(12) During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim;

-23-

(16)     The crime was committed under circumstances under which the potential for bodily injury to a victim was great[.]

Tenn. Code Ann. § 40-35-114.

The trial court determined that no mitigation factors were applicable.

First, the defendant argues that the trial court misapplied enhancement factor (2), that the defendant was a leader in the commission of an offense involving two or more criminal actors. The defendant contends that there was no evidence to indicate that the defendant entered the victims' house. We disagree. While circumstantial, there was evidence to suggest that the defendant actually participated in the crimes. Police recovered rounds from two different guns, a .9 mm and a .38 caliber, as well as shell casings from a .9 mm weapon, within the victims' residence. There was testimony indicating that the defendant left the vehicle carrying the .9 mm and returned in possession of the same weapon. While the defendant and Gagne went to the residence, a third person remained in the car. Further, there is evidence that the defendant boasted of the crime to his co-worker, Jacobs. All of this suggests that the defendant, while perhaps not the leader, was a leader in the commission of the crimes.

Second, the defendant argues that the trial court's application of Tenn. Code. Ann. § 40-35-114(3), that the aggravated burglary offense involved more than one victim, was erroneous. We disagree. This factor may be properly applied to a sentence for aggravated burglary when more than one victim was present at the time the crime was committed. See State v. Michael Wilson, Sean Kevin Wilson and Kenneth Quilter, Jr., No. 01C01-9602-CC-00073 (Tenn. Crim. App. at Nashville, July 31, 1997). Here, each of the victims was present when the burglary was committed. This factor was properly applied.

Third, the defendant argues that the trial court erred by applying Tenn. Code Ann. § 40-35-114(4), that a victim of the offense was particularly vulnerable because of age or physical or mental disability. Because the state did not present specific proof of the victims' vulnerability or show that it was a factor in the commission of the crime, we must agree. The vulnerability enhancement factor relates more to the natural physical and mental limitations of the victim than to age. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997). The state bears the burden of showing that specific limitations made a victim particularly vulnerable or that the vulnerability was a factor in the commission of the crime. Id. Here, there was only a showing that the victims were elderly. Proof of age, standing alone, is insufficient to establish particular vulnerability. See State v. Collins, 986 S.W.2d 13 (Tenn. Crim. App. 1998). Thus, Tenn. Code Ann. § 40-35-114(4) may not be applied to the aggravated burglary offense.

Fourth, the defendant maintains that the trial court erred by applying enhancement factor (5), that he treated or allowed the victims to be treated with exceptional cruelty. He maintains that because he never entered the house, it was impossible for him treat either of the victims with cruelty. We disagree. Our supreme court has ruled that before this factor may be applied, the facts in the case

must "support a finding of 'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. Poole, 945 S.W.2d at 98. Here, there was evidence that suggested the defendant entered the victims' home. Each of the victims was killed by a .9 mm weapon and the defendant returned from the scene with such a weapon. Furthermore, because Mr. Dotts and Mrs. Dotts, each of whom were still living when each of the shots were fired, sustained five and seven gunshot wounds respectively, there was evidence of exceptional cruelty.

Fifth, the defendant argues that the trial court erred by applying Tenn. Code Ann. § 40-35-114(6), that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great. He maintains that the factor should not apply, because very little property was taken and no great damage was done to the victims' house. Because serious bodily injury resulting in death is not an element of aggravated burglary, the trial court correctly applied the factor. See State v. Nix, 922 S.W.2d 894 (Tenn. Crim. App. 1995); see also State v. Griffis, 964 S.W.2d 577 (Tenn. Crim. App. 1997).

Sixth, the defendant maintains that the trial court erred by applying Tenn. Code Ann. § 40-35-114(9), that the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. He argues that because he did not enter the house, there was no evidence to support the application of the factor. We disagree. As noted earlier, there was circumstantial evidence to indicate that the defendant did, in fact, enter the residence. Almost all of the shots were fired from a .9 mm weapon. The defendant possessed a .9 mm weapon shortly after the commission of the crimes.

Seventh, the defendant contends that the trial court erred by applying Tenn. Code Ann. § 40-35-114(10), that the defendant had no hesitation about committing a crime when the risk to human life was high, and 40-35-114(16), that the crime was committed under circumstances where the potential for bodily injury to a victim was great. Aggravated burglary is the burglary of a habitation. Tenn. Code Ann. § 39-14-403. It is "aggravated" only because it is the burglary of a habitation as opposed to some other type of structure. Id. As this court has previously ruled, aggravated burglary carries a greater sentence than mere burglary. "In [enhancing the punishment for aggravated burglary], the General Assembly recognized that the potential for bodily injury to the victim is great when these crimes are committed. Thus, a trial court should not apply [enhancement] factor [(16)] absent extraordinary circumstances." State v. Smith 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994). Here, however, there were extraordinary circumstances. Two weapons were used during the course of the burglary. Each of the weapons was discharged. The victims were killed as a result. In our view, the factor was properly applied.

Finally, the defendant argues that enhancement factor (12) should not have been applied because there was no evidence that he willfully inflicted bodily injury upon another person or that his actions resulted in the death of the victims. As previously stated, there is evidence to support defendant's conviction for aggravated burglary and for the deaths which occurred during the course of that burglary. Because bodily injury is not an element of aggravated burglary, this issue is without merit. See State v. Freeman, 943 S.W.2d 25 (Tenn. Crim. App. 1996).

In summary, the trial court properly applied enhancement factors (1), (2), (3), (5), (6), (9), (10), (12), and (16) to the defendant's aggravated burglary sentence. The trial court misapplied factor (4). The presumptive sentence for the conviction is three years, the minimum in the range. Here, there were a multitude of enhancement factors. Despite the misapplication of factor (4), the maximum sentence was warranted. In our view, the six-year sentence for the aggravated burglary offense is appropriate.

B. Theft

In misdemeanor sentencing, the court is required to provide the defendant with a reasonable opportunity to be heard as to the length and manner of the sentence. The sentence must be specific and consistent with the purposes of the 1989 Act. Tenn. Code Ann. § 40-35-302(a) -(b). No greater than 75 percent of the sentence should be fixed for service by a misdemeanor offender; however, a DUI offender may be required to serve the full one hundred percent of his sentence. Tenn. Code Ann. § 40-35-302(d); Palmer v. State, 902 S.W.2d 391, 393-94 (Tenn. 1995). In determining the percentage of the sentence to be served, the court must consider enhancement and mitigating factors as well as the legislative purposes and principles related to sentencing. Tenn. Code Ann. § 40-35-302(d).

Upon service of the required percentage, the administrative agency governing rehabilitative programs determines which among the lawful programs available is appropriate for the defendant. The trial court retains the authority to place the defendant on probation either immediately or after a term of periodic or continuous confinement. Tenn. Code Ann. § 40-35-302(e) (Supp. 2000). The legislature has encouraged courts to consider public or private agencies for probation supervision prior to directing supervision by the Department of Correction. Tenn. Code Ann. § 40-35-302(f) (Supp. 2000). The statutory scheme is designed to provide the trial court with continuing jurisdiction and a wide latitude of flexibility in the misdemeanor case. The misdemeanant, unlike the felon, is not entitled to the presumption of a minimum sentence. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). Appellate review of misdemeanor sentencing is de novo with a presumption of correctness. See State v. Troutman, 979 S.W.2d 271 (Tenn. 1998).

The trial court applied the same enhancement factors to the theft convictions and imposed terms of 11 months and 29 days, with a 75 percent release eligibility. As with his aggravated burglary sentence, the defendant challenges the trial court's application of certain enhancement factors. Enhancement factor (3) would not apply since the defendant was convicted separately for theft from each victim. See State v. McKnight, 900 S.W.2d 36, 54 (Tenn. Crim. App. 1994). Because the state failed to establish particular vulnerability, as required, factor (4) does not apply. All of the other enhancement factors applicable to the aggravated burglary sentence are also applicable to the theft sentences. Even though enhancement factors (3) and (4) were misapplied, however, the remaining enhancement factors would clearly justify the sentence imposed. The circumstances warrant a sentence of 11 months and 29 days at 75 percent for each of the thefts.

C. Consecutive Sentences

The defendant maintains that the trial court erred in ordering that his sentences be served consecutively. He contends that he has no "extensive" criminal activity and that he is not a dangerous offender.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Id. at 230.

The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[3] exist:

(1) The defendant is a professional criminal who has knowingly devoted [himself] to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

---

[3]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

(6)      The defendant is sentenced for an offense committed while on probation; or

(7)      The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); see also State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

In imposing consecutive sentences, the trial court ruled as follows:

The Court . . . finds that you . . . are a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The imposition of consecutive sentence[s] is necessary to protect the public against further criminal conduct by the defendant, and that consecutive sentences in this matter reasonably relate to the severity of the offense committed.

In Gray, our supreme court ruled that consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, only when other conditions are present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938. The elements adopted in Wilkerson as required for a finding of dangerous offender are as follows: that the sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. Id.

The record supports the imposition of consecutive sentences. First, the term reasonably relates to the severity of the offenses. Proof adduced at trial shows that the defendant was a willing participant in a burglary in which two elderly victims were killed. Evidence established that Mr. Dotts sustained five gunshot wounds and that Mrs. Dotts sustained at least seven gunshot wounds. The evidence further shows that the defendant participated in the theft of Mrs. Dotts's purse and Mr. Dotts's wallet and business checks. Second, the defendant, while having no prior convictions, does have an extensive criminal history. At trial, the defendant admitted that he had "broke[n] into some cars," stolen cars, and previously engaged in a shootout with Gagne. Some of the incidents resulted

in arrests for three counts of auto theft, three misdemeanor charges of possessing a weapon, simple possession of marijuana, and possession of drug paraphernalia. In our view, consecutive sentences are necessary to protect the public against further criminal conduct. Finally, because of the severity of the offenses and the aggravating circumstances involved, the imposition of consecutive sentences is congruent with general principles of sentencing.

X

As his final issue, the defendant contends that the trial court erred by dismissing his petition for a writ of error coram nobis. He maintains that the trial court should have considered "newly discovered" evidence, in particular, the statement of Robert Manning and the testimony of Shannon Langdon.

The history of error coram nobis was examined by our supreme court in State v. Mixon, 983 S.W.2d 661 (Tenn. 1999). In that case, our supreme court observed that the writ of error coram nobis was developed at common law as a procedural mechanism to allow courts to provide relief at a time when there was no motion for new trial and no right to appeal. Id. at 667 (citing Morgan Prickett, Writ of Error Coram Nobis in California, 30 Santa Clara L. Rev. 1, 3 (1990)). The writ permitted "a trial court to reopen and correct its judgment upon discovery of a substantial factual error not appearing in the record which, if known at the time of judgment, would have prevented the judgment from being pronounced. Id. (quoting John S. Gillig, Kentucky Post Conviction Remedies and the Judicial Development of Kentucky Rule of Criminal Procedure 11.42, 83 Ky. L. J. 265, 320 (1994-95)). In order for a petitioner to qualify for relief, he had to demonstrate due diligence in advancing the claim and seeking the remedy. Id.

In 1858, our legislature enacted a statute which codified the procedure for seeking the writ of error coram nobis, expanded the grounds upon which a claim for relief under the writ could be based, and placed a time limitation upon its filings which provided that "'[t]he writ of error coram nobis may be had within one year from the rendition of the judgment. . . .'" Id. (quoting Code 1858, § 3111; Jones v. Pearce, 59 Tenn. 281, 286 (1873)). At common law, the writ had been limited to civil proceedings only. Id. at 668.

In 1955, the writ of error coram nobis was extended to criminal proceedings. Id. The relief available extended only to "'errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.'" Id. (quoting 1955 Tenn. Pub. Acts 166).

In 1971, the adoption of Rule 60 of the Tennessee Rules of Civil Procedure superseded the statutory writ in civil cases. Id. The remedy remained in criminal proceedings. Id. Tennessee Code Annotated § 40-26-105 (1997) provides as follows:

> There is hereby made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and procedure applicable to the writ of error coram nobis in civil cases, except

insofar as inconsistent herewith.   Notice of the suing out of the writ shall be served on the district attorney general.  No judge shall have authority to order the writ to operate as a supersedeas.  The court shall have authority to order the person having custody of the petitioner to produce the petitioner in court for the hearing on the proceeding.  The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on the motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.  Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.  The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause. . . .

Id. (emphasis added.)

In this case, the trial court denied the petition because it did "not cover material that is newly discovered."  The trial court observed that counsel had acknowledged the receipt of "information from an individual named Shannon Langdon implicating Eric Steyer and Robert Manning in the burglary of the residence of and the murder of Lester and Carol Dotts" prior to trial.

The trial court concluded that "Shannon Langdon received the information she was testifying to in January of 1996" and the trial did not take place until 1998:

She testified that she discussed the matter throughly with attorneys for the defendant/petitioner prior to trial.  This could hardly be subsequently or newly discovered evidence if known by this witness and related to the attorneys for the defendant/petitioner prior to trial.

In addition, the witness Eric Steyer was available since he was in the custody of the Michigan Department of Corrections during and prior to trial which would rendered the hearsay testimony of Langdon inadmissible.  The petitioner was hardly without fault in failing to present the Court with "newly discovered evidence" and should not be permitted to hold this information in abeyance through the trial and then present the same under the guise of a Writ of Error Coram Nobis.

The trial court also concluded that Manning's statement could be given no credibility, partly because of his refusal to testify at the hearing; that Steyer denied any involvement in the crimes; and that the testimony of Jean Lynn Brykalski, the victims' daughter, established inconsistencies between the crime scene and Manning's account of the events.

The trial court also referred to the confession of Watts and the defendant's own inculpatory statements.  Because the issues raised in the petition were available to the defense at the time of trial, the trial court properly denied relief.  A new trial would not be warranted on newly discovered evidence.

Accordingly, the defendant's felony murder convictions are reversed and the case is remanded for a new trial thereon.  The defendant's remaining convictions and sentences are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE